Willie Lee **SHEPHARD**, Plaintiff-Appellant,

v.

**S/S NOPAL PROGRESS** et al., Defendants-Third Party Plaintiffs-Appellees,

v.

**T. SMITH AND SON, INC.**, Third Party Defendant-Appellee.

No. 73–2031.

United States Court of Appeals, Fifth Circuit.

July 26, 1974.

Rehearing and Rehearing En Banc Denied Oct. 7, 1974.

Walter F. Gemeinhardt, New Orleans, La., for plaintiff-appellant.

John A. Bolles, Benjamin W. Yancey, New Orleans, La., for A/S Sobral and Nopal.

Maurice C. Hebert, Jr., New Orleans, La., for Smith & Son.

Before WISDOM, AINSWORTH and GODBOLD, Circuit Judges.

AINSWORTH, Circuit Judge:

This suit involves a claim for damages of a longshoreman against a ship and its owner, for personal injuries sustained while unloading the vessel. Appellant, Willie Lee Shephard, a longshoreman employed by T. Smith & Son, Inc., was injured on July 14, 1968 while unloading cargo from the M/S NOPAL PROGRESS, owned and operated by A/S Sobral at the port of New Orleans. He filed suit against the ship and its owner under the Jones Act [1] and general maritime law, alleging negligence and unseaworthiness. Defendant A/S Sobral in turn filed a third-party claim for indemnity against the stevedoring company, T. Smith & Son, Inc.[2] The Jones Act claim was subsequently dismissed and the case proceeded to trial before a jury. At the conclusion of plaintiff's evidence, the trial court sustained defendants' motion for a directed verdict against plaintiff, based on his finding that the accident was caused solely by the operational negligence of plaintiff's co-workers. Trial of the third-party complaint against T. Smith & Son, Inc. was stayed by the court pending the outcome of this appeal by Shephard.

Appellant contends that the trial court was in error in granting a directed verdict inasmuch as there was evidence showing that the accident and resultant injuries were caused by the unseaworthinss of the vessel and/or the negligence of A/S Sobral in failing to provide a safe place to work, both of which questions should have been resolved by the jury. We disagree. We find that a directed verdict in favor of defendants was proper and affirm.

On July 14, 1968, T. Smith & Son was discharging a cargo of frozen meat from the No. 3 hold of the M/S NOPAL PROGRESS in the Mississippi River at New Orleans. The cargo was contained in packages which were numbered to distinguish the types of meat. Warm air meeting the refrigerated air caused a foggy or hazy condition to prevail which decreased visibility in the hold. The operation consisted of separating the different packages and loading them on to pallet boards which were lowered by derrick into the refrigerated hold. The pallet boards were taken up from the hold by the use of spreader bars which fit on each side of the pallet board. Four men were working each pallet board, two to each side. After the spreader bars were unhooked by the men the foreman would signal the derrickman, who would then signal the winch operator to pull up on the load. Two crews of longshoremen were working inside the No. 3 hold. At approximately 2 a. m., plaintiff was hit behind the right ear by a spreader bar and the attached hook when the spreader bar was prematurely released from the pallet board. The accident caused the injuries to plaintiff which form the basis of this complaint.

---

1. 46 U.S.C. § 688.

2. As a result of the 1972 Amendments to the Longshoremen's & Harbor Workers' Compensation Act (86 Stat. 1251) this typical Ryan-type [see Ryan Stevedoring Co. v. Pan Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)] indemnity action is no longer permitted. The accident in the present case, however, occurred prior to these Amendments.

Appellant contends that the overcrowded and foggy refrigerated hold constituted unseaworthiness and an unsafe working place, and that by permitting such a condition to exist the shipowner was guilty of negligence, which negligence and unseaworthiness were proximate causes of the accident.

It is a familiar and well-established rule that it is the shipowner's obligation to furnish seamen and longshoremen performing seamen's work a seaworthy vessel, including seaworthy appurtenances and equipment, as well as a safe place to work, and this obligation extends to the area where the loading and unloading operations are performed. Mahnich v. Southern S. S. Co., 321 U.S. 96, 102, 64 S.Ct. 455, 458, 88 L.Ed. 561 (1944); Strachan Shipping Company v. Alexander, 5 Cir., 1962, 311 F.2d 385, 386; Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Equally familiar is the rule that the warranty of seaworthiness owed by the shipowner extends to the gear of the stevedore as well as that of the ship. Alaska Steamship Company v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954). Appellant does not contend, however, that any of the stevedore's hoisting or loading gear nor the ship's gear to which it was attached was defective or malfunctioning. The testimony was unanimous to the contrary.[3] Instead appellant attributes his injuries to the fog and crowded conditions in the hold.

Although there was evidence that the No. 3 hold was crowded, this condition cannot be attributed to the shipowner. It was the stevedore's decision to use two gangs instead of one. The unloading operation was performed and supervised solely by the stevedoring company. We have held that the mere fact "that the area in which a longshoreman may be obliged to work is cramped or confining does not render the area unsafe as a matter of law." Wilson v. Societa Italiana de Armamento (Sidarma), 5 Cir., 1969, 409 F.2d 484, 485. Despite the fact that two gangs were working the hold, there was no evidence connecting a crowded condition to the accident, nor was there evidence that such a condition interfered with the usual procedure of lowering or hoisting the gear and cargo or attaching or disengaging the spreader bars.

There is no dispute that the No. 3 hold was filled with vapor or fog because of the frozen cargo. However, there is likewise no dispute that this was normal and expected.[4] More importantly, there

---

3. Julius Mills, longshoreman, testified on cross-examination:

> Q. Mr. Mills, are you saying the chains and spreader bar were attached to the hook?
> A. Wait, Cap, let me tell you. I told you all exactly how it happened. I said when they lowered the whole thing down, that's what hit him.
> Q. You say nothing came loose?
> A. Nothing came loose, no sir.

Mills' testimony was typical. On cross-examination Elson Jones, longshoreman, said:

> A. I seen the whole spreader bar and the hook land on his head.
> BY THE COURT:
> You said, if it came down, the whole thing would come down, is that right?
> A. Right.
> Q. Couldn't the spreader bar have come loose from the hook and fallen on him?
> A. No.

Matthew Conner, a Union delegate who was called aboard the vessel, was asked by defense counsel:

> Q. Nothing came loose?
> A. Nothing came loose that I saw.

Chaz Ward, longshoreman, was asked by the Court?

> Q. Did one end of the spreader bar come loose, and then the hook on the other end hit him?
> A. No, it didn't come loose.

4. Matthew Conner testified that the fog was "a medium fog probably" and was then asked what caused the fog, to which he replied, "As usual fog will come when you are working with frozen meat down in the lower hold." Nathan Bell was asked on direct examination if he had ever worked reefer (refrigerated) cargo in the lower hold. He said that he had and was then asked, "Is it foggy down there when you are working reefer

is nothing in the record to show that the fog in any way caused the accident. Appellant places great emphasis on the fact that the haze limited visibility within the hold and that the men had difficulty in separating the packages of meat by identifying numbers. Nevertheless the two holds situated above the No. 3 hold had been unloaded prior to the accident. There is no evidence or indication of mistake having been made by the longshoremen in selecting the wrong packages for loading. Despite the fog, visibility was adequate to enable Elson Jones, a longshoreman working in the No. 3 hold, to observe from a distance of 15 to 17 feet that at the time of the accident one of the spreaders had been disengaged from the pallet board and that Shephard's spreader was still attached.

█ In order to prevail plaintiff must show that either the unseaworthiness of the vessel or the negligence of the shipowner proximately caused his injury. This plaintiff failed to do. We have reviewed the entire transcript and the record and find no evidence that either the crowded condition of the hold or the fogginess produced by the frozen cargo proximately caused the accident. On the other hand, there is convincing evidence that the accident and resultant injuries were solely and proximately caused by the operational negligence of employees of the stevedore company. The record shows that immediately prior to the accident empty pallets had been lowered into the hold. Appellant and his three co-workers were in the act of disengaging the spreader bars from a pallet board when the accident suddenly occurred, obviously because of the lack of coordination among the men.

On cross-examination plaintiff was asked:

Q. Mr. Shephard, as I understand it, while you still had your spreader bar engaged, someone heaved on the winch, and the winch moved and the spreader bar moved; is that right?

A. Yes, sir, the winch jacked up.

He was further asked on cross-examination:

Q. I say, it is not unusual for one gang to have their spreader bar out before the other one, isn't that right?

A. That happens often, two of them —their end might get kind of fouled up or something, and they are kind of slow getting it out, but the other end will stay loose, and they can get it out faster, you know.

Q. In other words, you hadn't yet tried to pull your end out when this accident happened, is that right?

A. I was trying to get it out.

The winch operator explained that if a man inadvertently releases the spreader prematurely it may result in injury. He testified on cross-examination:

If you have two men working in the ship's hold, handling the spreader bar and hooking the load, and if they unhook a spreader bar, and one side gets unhooked, and the other side is not completely unhooked, and someone says "Get up", and you get up, someone is bound to get hit with the other spreader bar, because the weight is going to pull the bar out of the other fellow's hand, and it will swing over and hit somebody.

Three fellow workers, eyewitnesses to the accident, corroborated the fact that the spreader hit plaintiff without warning during the unloading operation. In answer to the trial judge's question Chaz Ward testified to this version of the accident:

When they pull the board, they pull it, you understand, to the coaming, and it was loaded, and then one end was so low down from the way the load was

cargo?" He replied, "It is." Elson Jones on cross-examination said, "Well, with the frozen foods, there's always a lot of fog; when the food is frozen."

that it jumped loose, and that made the spreader bar swing away from the coaming of the ship, coming this way, to him, and before he could get out of the way, you understand, the man done lowered down the whole spreader bar down on top of his head.

Another eyewitness, Julius Mills, who was working as Shephard's partner, testified on cross-examination:

They lowered down on him, do you understand what I mean? He wasn't expecting it, because it just missed me. You know what I mean. It almost got me. The meat was blocked out, you understand, and he had no room to get out of the way.

On direct examination, Elson Jones, who was working in the vicinity, testified:

They landed the board, and the men on the offshore side was unhooking the spreader bars, and the ones on the inside they did not unhook them, and when they got up on the spreader bars, all of a sudden they came down on Willie's head, and spreader bars and all.

Jones was further questioned on cross-examination:

Q. And you saw the other side disengage their spreader bar from the pallet board, is that what you said?

A. Right.

Q. Had Mr. Shephard gotten his loose yet?

A. No.

The derrickman testified that he had received a signal from the foreman which he relayed to the winchman. The winch operator testified that he received the signal from the derrickman.

Thus the evidence offered by plaintiff shows nothing more than that the negligence of one or more of his fellow workers caused the accident, as the result of ill timing or lack of coordination, occurring at the instant of the mishap.

■■ It is now well settled that the isolated, personal negligent act of a longshoreman's co-worker does not render a vessel unseaworthy. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 500, 91 S.Ct. 514, 518, 27 L.Ed.2d 562 (1971). *See also* Antoine v. Lake Charles Stevedores, Inc., 5 Cir., 1967, 376 F.2d 443, 447; Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir., 1969, 412 F.2d 1011; Duncan v. Transeastern Shipping Corporation, 5 Cir., 1969, 413 F.2d 1023, 1024; and Robinson v. M/V Merc Trader, 5 Cir., 1973, 477 F.2d 1331, 1333, which stand for the principle that the momentary operational negligence of a fellow worker occurring at the time of injury does not convert an otherwise seaworthy vessel into an unseaworthy one. We find that this case is governed by the cited authorities above. Thus a directed verdict was mandated at the conclusion of plaintiff's case under the holding of Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365 (en banc). *Boeing* requires that the district court direct a verdict "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." 411 F.2d at 374. This was such a case.

Affirmed.

GODBOLD, Circuit Judge (dissenting).

When all the evidence is considered this was a normal jury case.

(1). How did the accident happen? The majority conclude that it occurred from lack of coordination among the members of the stevedore crew. But merely examining the testimony quoted in the majority opinion reveals that there are two versions. One is that when Shephard's side of the spreader bar was still engaged and the other side disengaged, the winch lifted up on the spreader, causing the other end to swing around and strike Shephard. The other version (see quoted testimony of Ward and Mills) is that when a pallet was being lowered into the hold the spreader bar struck Shephard on the head. Ward

described in detail that, rather than the spreader bar being disengaged by the workmen in the hold, it jumped loose from the pallet because of the manner in which the pallet was loaded, after which, before Shephard could get out of the way, the winchman let the loose spreader down on Shephard's head.

Choice between these competing versions was for the jury. The selection of versions is important, because, if the jury chose to believe that Shephard was struck during a lowering operation, then this additional testimony of Mills, Shephard's partner, becomes vital:

A. They lowered down on him, do you understand what I mean? *He wasn't expecting it,* because it just missed me. You know what I mean. It almost got me. The meat was blocked out, you understand, and *he had no room to get out of the way.*

Q. Did that hook that hit him disengage or come loose from the falls?

A. It did not come loose, but it hit him, you understand what I mean? *I got out of the way, but he couldn't go nowhere but right there,* and it hit him, you understand what I mean.

\* \* \* \* \* \*

A. Wait, Cap, let me tell you. I told you'all exactly how it happened. I said *when they lowered the whole thing down, that's what hit him.*

\* \* \* \* \* \*

Q. And that's [the hook holding the spreader bar] what hit him, is that right?

A. They *lowered it down, and it hit him,* yes sir.

(2). Crowded conditions in the hold. Two gangs, close to 20 men, were working in the hold under crowded conditions. The gangs were using two pallet boards, on each of which was piled packages of meat, after which the loaded pallet was winched out through the hatch opening. The men were working back to back between the two pallets. The foreman of Shephard's crew described it as a "dangerous disposition" to have two gangs in this particular hold. He referred to the unloading procedure thusly:

Q. Could you describe the dangerous condition that you said existed in the lower hold at that time?

A. Well, it was a hazard working like that.

Q. Like what, sir?

A. I mean, working them men between them boards, two gangs— no way to get out of the way.

Oftentimes two gangs work in the same hold of a refrigerator ship, but the union delegate testified that he had never before heard of two gangs working in the particular hold of this vessel because of its small hatch. Prior to the accident one or more stevedores considered the working conditions so dangerous in the hold that a complaint was made to the union representative. A union delegate was called and came aboard to intercede concerning the dangerous conditions. He told the foreman the hatch was too small for two gangs to be working. The foreman referred him to the superintendent with whom the delegate then discussed the matter. The delegate was still aboard when Shephard was hurt. The delegate stopped one of the gangs from working because of the conditions. The gang was pulled off for about an hour and a half, and was put back to work on orders of the superintendent. After that the accident occurred.

To this evidence, the majority responds with findings to this effect: (a) there was no evidence connecting the crowding to the accident; (b) crowding is not unseaworthiness as a matter of law; (c) in any event, the crowded conditions cannot be attributed to the shipowner because the loading operation was performed and supervised by the stevedoring company.

As to (a), as I already have pointed out, witness Mills squarely relates crowding to the accident. As to (b), the

issue is not whether crowding rendered the area unsafe as a matter of law but whether, with evidence having been presented of crowding and of its causal relation to the accident, the trial judge may decline to submit to the jury the issue of the lack of safety from crowded conditions.[1] As to the third reason,

> It is well settled that an improper method of handling cargo employed by a stevedore can create an unseaworthy condition. Morales v. City of Galveston, 1962, 370 U.S. 165, 170, 82 S.Ct. 1226, 8 L.Ed.2d 412; Marshall v. Ove Skou Rederi A/S, 5 Cir. 1967, 378 F.2d 193, 196. Thus, the determinative question on this appeal is whether or not defendant employed an improper method of handling cargo.

Baker v. S/S Cristobal, 488 F.2d 331, 332 (CA5, 1974). For a lengthy catalogue of some of the federal cases holding unsafe unloading to be unseaworthiness, see Blassingill v. Waterman Steamship Corp., 336 F.2d 367 at 369 (CA9, 1964). The crowded conditions and the fog were conditions that had been in effect for several hours and are not even arguably "instantaneous unseaworthiness."

(3). The issue of signals. The winch operator was "blind," unable to see into the hold because of the construction of the ship. A derrickman was "flagging" the winch by receiving signals from the men in the hold and in turn signaling to the winch operator. The derrickman testified that just before Shephard was hurt a pallet was loaded into the hold, and he saw a man reach around and unhook the spreader bar and give a signal. He described it this way:

> I saw the figure of a man, giving me a signal, because it was just that vague, and I hauled up, to bring it to the offshore side to pick up a load,

and that's when somebody hollered, "A man is hurt."

It was for the jury to decide whether this ambiguous reference related to impaired visibility because of the fog or vagueness of the meaning of a perceived signal. Also the derrickman described the foggy condition in the hold as "really bad down there," and explained that he could not see all of the men but could see those closer to him.

(4). The foggy condition in the hold. While acknowledging that the hold was filled with vapor or fog, the majority meet appellant's argument concerning visibility by selectively extracting from the testimony evidence that tends to show that visibility was not impaired—i. e., that the longshoremen were able to identify numbers on the packages of meat and that longshoreman Jones had been able from a distance of 15 to 17 feet to see details of the accident. Only a few of many references in the testimony serve to demonstrate that impairment of visibility was for the jury and not for judges, trial or appellate:

> Q. Wait just a minute. What did the fog have to do with the hook hitting him?
>
> A. [Longshoreman Mills, Shephard's partner] What I mean, well, it was all foggy, and you couldn't hardly see nothing, you understand. It was awful foggy, and you couldn't see nobody else down there.
>
> Q. You couldn't see anything?
>
> A. No, sir, it was awful foggy.
>
> Q. How could you load the pallet board if you couldn't see anything?
>
> A. Well, we've got to try to work anyhow, you understand. You got to do the best you can.

> \*　　\*　　\*　　\*　　\*　　\*

---

1. In Wilson v. Societa Italiana de Armamento (Sidarma), 409 F.2d 484, 485 (CA5, 1969), cited by the majority, the district court as finder of fact in a bench trial had found the allegedly cramped area not unsafe. On appeal we found this factual finding not clearly erroneous and held also that cramped conditions were not unsafe as a matter of law. This is hardly authority that where there is evidence of unsafe and dangerous conditions from overcrowding, the court may hold the conditions safe as a matter of law.

Q. You say it was foggy. Do you know what was causing that fog?

A. Well, I don't know what caused the fog, but it was awful foggy. You couldn't see nothing at all.

\* \* \* \* \* \*

A. . . . After he got hurt, we still kept on working, but it was still too hard to work down there.

Q. Why do you say that, "it was too hard to work"?

A. Well, you still couldn't see anything. You can't see in the hold when it's foggy like that.

Q. Did they have lights?

A. Are you kiddin'? Just like I told you, or anybody else, the lights they had on ship, you couldn't see with the lights. It was just that foggy.

I have not attempted to lay out everything in the record relevant to these issues. This kind of exploration of factual issues is for the trier of fact. I respectfully dissent.