Whitney ALLEN, Plaintiff-Appellee,

v.

SEACOAST PRODUCTS, INC., et al.,
Defendants-Appellants.

No. 79–3210
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Aug. 6, 1980.

Rehearing Denied Sept. 15, 1980.

* Fed.R.App.P. 34(a); 5th Cir. R. 18.

Stockwell, Sievert, Viccellio, Clements & Shaddock, Robert W. Clements, Lake Charles, La., for defendants-appellants.

J. Minos Simon, Lafayette, La., for plaintiff-appellee.

Before BROWN, TJOFLAT and FRANK M. JOHNSON, Jr., Circuit Judges.

JOHN R. BROWN, Circuit Judge:

A tragic maritime accident cost Whitney Allen his right eye. Allen was a seaman board the *M/V Louisiana*, a Seacoast Products, Inc., vessel. He sued alleging (i) negligence on the part of Seacoast agents and employees under the Jones Act, 46 U.S.C.A. § 688, and (ii) unseaworthiness of the vessel under general maritime law. Seacoast's insurers,[1] were also named defendants. The defendants asserted that Allen's damages were diminished or barred by his contributory negligence. The case was tried before a jury but at the close of evidence the Trial Judge made a F.R.Civ.P. 50(a) finding that Seacoast was solely liable for Allen's injuries. Following the directed verdict, the jury considered only damages and awarded

1. United States Fidelity & Guaranty Co., The Netherlands Insurance Co.

$240,000. Seacoast appeals, raising unexceptional issues concerning whether unseaworthiness, negligence, and a lack of contributory negligence were adequately shown; and whether the damage award was excessive. To those is added a more interesting one concerning the imputation of liability to Seacoast where the employee-agent causing the accident was allegedly acting outside the scope of his authority. We find no error and affirm.

The *Louisiana* is a 165-foot seiner "mother" ship. It is specifically designed to net and store up to 1,100,000 pounds of Menhaden fish for transfer to Seacoast fish meal processing plants. Two 36-foot boats, normally carried on either side of the mother ship, are used to spread and control the seine nets. The *Louisiana* did not cast its nets randomly, however. It was rather one of a 26-ship Seacoast fishing "navy" assisted by a virtual air force of spotter aircraft. Normally the navy lay offshore until the air force spotted schools of Menhaden in the area. The schools' locations would then be radioed to the navy, and any ship in its discretion could attack the schools. The radio transmissions were loosely monitored by shore based Seacoast supervisors.

Well into the June 22, 1977, fishing day, the spotter aircraft had been unable to locate any fishing for the *Louisiana*. The pilots had, however, spotted a partially sunken vessel nearby. The captain, Clarence Dixon, decided to investigate the salvage possibilities and radioed the pilots for a heading. The *Louisiana* then set sail for the location, where Dixon discovered the disabled vessel, a 45-foot shrimper with stern floating up in the air. If there was enough buoyancy left in the shrimper, Dixon thought the vessel salvageable.

"Maritime law in every way and in every context encourages the salvor to salve—to save." *Grigsby v. Coastal Marine Service*

of Texas, Inc., 412 F.2d 1011, 1021, 1969 A.M.C. 1513, 1525 (5th Cir. 1969) (Brown, C. J.). Salvors are rewarded most handsomely in admiralty, according to the risk involved, the value of the property saved, and the part played by the individual salvor. G. Gilmore & C. Black, The Law of Admiralty § 8–1, at 532 (2d ed. 1975). This "effective flexible, enforceable reward," 412 F.2d at 1021, 1969 A.M.C. at 1525, is usually apportioned between the owner of the salving vessel, its captain, and crew—the owner usually receiving the most substantial portion. 1 M. Norris, The Law of Seaman §§ 188–91 (3d ed. 1970). The admiralty's encouragement of salvage has been traced to the sea codes of the ancient Rhodians and of the Romans [2] and is still encouraged by common law, statute [3], and treaty [4]. "[O]f all branches of jurisprudence, the admiralty must be the one most hospitable to the impulses of man and law to save life and limb and property." *Grigsby v. Coastal Marine Service of Texas, Inc., supra*, 412 F.2d at 1021, 1969 A.M.C. at 1525. *See also Miss. Valley Barge Line Co. v. Indian Towing Co.*, 232 F.2d 750, 755, 1956 A.M.C. 757, 763–64 (5th Cir. 1956) (Brown, J.); Friedell, *Compensation and Reward for Saving Life at Sea*, 77 Mich.L.Rev. 1218 (1979).

Acting on this impulse so encouraged by the admiralty, Captain Dixon attempted to salvage. He decided to attach the lifting cables of the davits used for the 36-foot boats and then pull the shrimper into shallow waters. There, the partially sunken vessel could be dragged ashore by land-based winches. But all of this depended on bringing the *Louisiana* alongside and on there being some flotation remaining in the shrimper (since the *Louisiana*'s lifting cables were not capable of raising such a large, partially sunken vessel out of the water). So to test the shrimper's buoyancy and then to bring the *Louisiana* close

---

**2.** H. Baer, Admiralty Law of the Supreme Court § 20–3 (3d ed. 1979); 1 M. Norris, *supra*, § 180.

**3.** 46 U.S.C.A. §§ 727–31 & 1304(4).

**4.** *E. g.* Salvage Convention of 1910, September 22, 1910, ratified by United States Senate, 37 Stat. 1658 (1912), *reprinted in* H. Baer, *supra* note 2, at 915; The Aviation Salvage at Sea Convention, September 28, 1938, 1938 U.S. Aviation Rep. 252, *reprinted in* 6B Benedict, Admiralty 1253 (7th ed. 1969).

enough to attach the lifting cables, Captain Dixon took out one of the 36-foot boats and strung two 50-foot mooring lines between the stern of the shrimper and the bow of the *Louisiana*. The lines were strung in a separated configuration, from the side of one vessel to the side of the other, and were not "doubled up." The lines used were one and a quarter inch diameter nylon lines, normally used in a doubled up manner for tying the *Louisiana* to a dock. Captain Dixon then returned to the bridge of the *Louisiana*. Allen noticed that the captain had cut his legs when coming back aboard and followed him to the bridge.

Captain Dixon then had the pilot back the *Louisiana* away from the shrimper, pulling on the lines, "to see if the shrimp boat was still . . . partially floating." Nothing happened until the captain decided to stop backing the *Louisiana*. At that point the sea surged and one of the already taut lines parted. Like a rubber band, the line flew back and hit Allen as he stood on the bridge, causing the eventual loss of his eye.

At the close of the essentially undisputed evidence, the Trial Judge granted Allen's motion for a directed verdict on liability, stating that "there's no way that a jury composed of reasonable people could reach a different conclusion on the facts of this case. . . ." The Judge found the *Louisiana* unseaworthy because use of the inadequate mooring lines created a hazardous condition. Alternatively, he found the action of backing the *Louisiana*, putting tension on the line, was clearly negligent. And the vessel's unseaworthiness and the captain's negligence could be imputed to Seacoast because salvage operations, though unusual, were clearly within the discretion given by Seacoast to Captain Dixon. Finally, he found that Allen was not contributorily negligent. Accordingly, only the issue of damages was considered by the jury. They awarded Allen $240,000.

### Standard Of Review

In order to review the Trial Judge's directed verdict, we must first identify the standard used to test whether there was sufficient evidence to submit the liability issue to the jury. The Trial Judge plainly applied the "reasonable man" standard (except possibly as to his finding of no contributory negligence) articulated in *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

█ The *Boeing* (reasonable man) standard is the one used by a trial court in its initial ruling and by this Court on appeal for all but a few types of claims. It is, for example, used for unseaworthiness claims. *Claborn v. Star Fish & Oyster Co.*, 578 F.2d 983, 987, 1979 A.M.C. 636, 642 (5th Cir. 1978); *Robertson v. Douglas S.S. Co.*, 510 F.2d 829, 833, 1975 A.M.C. 1021, 1028 (5th

Cir. 1975); *Shephard v. S/S Nopal Progress*, 497 F.2d 963, 967 (5th Cir. 1974). But *Boeing* specifically recognized that its standard did not apply to Jones Act claims.[5] In Jones Act cases the more severe FELA standard[6] was held appropriate: a directed verdict is possible "only when there is a *complete absence* of probative facts" supporting the nonmovant's position. 411 F.2d at 370. *Boeing* reasoned that directed verdicts should be disfavored in Jones Act cases because (i) the Jones Act was to be interpreted liberally in the seaman's favor; (ii) the seaman had only to prove "slight negligence," which could be accomplished by very little evidence; and (iii) adjudication by a presumably seaman-sympathetic jury in Jones Act cases was congressionally intended to provide "part of the remedy." 411 F.2d at 371. *Boeing* therefore endorsed a long line of cases applying the FELA standard to Jones Act claims.

Despite one subsequent inconsistency by a panel of this Court,[7] the *Boeing* en banc Court's approval of the use of the more severe FELA standard in Jones Act cases is the law of this Circuit. *E. g., Bazile v. Bisso Marine Co.*, 606 F.2d 101 (5th Cir. 1979). However, the issue of whether the FELA standard should apply to a directed verdict in a seaman's *favor* just as to those *against* a seaman has never been specifical-

ly addressed by this Court. The reasons given for *Boeing*'s endorsement of the more severe FELA standard apply only to a directed verdict against a seaman. A directed verdict in a seaman's favor, as here, (i) furthers the Act's purpose, (ii) is consistent with the seaman's "featherweight"[8] burden of proof, and (iii) provides as much remedy to the seaman as could the most sympathetic jury. There is consequently much reason to apply the usual *Boeing* standard to verdicts in a seaman's favor and limit the FELA standard to directed verdicts against a seaman.[9]

■ We need not decide the issue, however. The *Boeing* standard is clearly applicable to unseaworthiness claims. And to the extent we reach the Jones Act claims, we will nonetheless apply the FELA standard.

### Unseaworthiness

■ Attempting to move a 45-foot shrimp boat, partially under water, with inch and a quarter nylon mooring line is a classic case of unseaworthiness. It may be assumed the line, which was fairly new, was seaworthy for its usual function: when doubled, mooring the *Louisiana* to a relatively nearby dock in sheltered waters. It is established beyond question that misuse of even nondefective, otherwise seaworthy

---

**5.** The panel decision in *Boeing* held that the appropriate standard for *all* types of cases was that developed in Federal Employers' Liability Act, 45 U.S.C.A. § 51 *et seq.*, cases (hereafter "FELA standard"). *Boeing Co. v. Shipman*, 389 F.2d 507, 513 (5th Cir. 1968). The en banc Court disapproved of that holding, and limited the FELA standard to FELA and Jones Act cases. 411 F.2d at 370. The en banc Court held that a "reasonable man" standard (hereafter "*Boeing* standard") was appropriate for cases other than FELA and Jones Act cases.

**6.** *See* note 5, *supra*.

**7.** *Andry v. Farrell Lines, Inc.*, 478 F.2d 758, 759 (5th Cir. 1973) (per curiam) (both Jones Act and unseaworthiness claims rejected using *Boeing* reasonable man standard). *Cf. Holland v. Allied Structural Steel Co.*, 539 F.2d 476, 482–83, 1977 A.M.C. 2458, 2466–67 (5th Cir. 1976) (seaman's status a mixed law-fact issue but *Boeing* reasonable man standard referred to); *Landry v. Amoco Production Co.*, 595 F.2d 1070, 1074 (5th Cir. 1979) (District Court

should have directed verdict that plaintiff had seaman's status for Jones Act suit since "reasonable persons" could not conclude otherwise).

**8.** *Landry v. Two R. Drilling Co.*, 511 F.2d 138, 142, 1975 A.M.C. 2135, 2140 (5th Cir. 1975).

**9.** It has been suggested, however, that the *Boeing* reasonable man standard when applied to a directed verdict in plaintiff's favor requires evidence more "overwhelming" than for a directed verdict in defendant's favor. 9 C. Wright & A. Miller, Fed.Practice & Procedure § 2535, at 592–93 (1971 ed.). *See also Grey v. First Nat'l Bank in Dallas*, 393 F.2d 371, 380 (5th Cir.), *cert. denied*, 393 U.S. 961, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968). That difference in application suggests that even using the *Boeing* standard for a directed verdict in a seaman's favor will nonetheless be almost as strict as the FELA standard.

equipment may nevertheless create an unseaworthy condition. 2 M. Norris, The Law of Seaman § 621 (3d ed. 1970); 1 Benedict, Admiralty § 24, at 3–75 to 3–76 (7th ed. 1976); *Symonette Shipyards, Ltd. v. Clark*, 365 F.2d 464, 1966 A.M.C. 2383 (5th Cir.) (cable spliced improperly), *cert. denied*, 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1966); *Venable v. A/S Det Forenede Dampskibsselskab*, 399 F.2d 347, 1968 A.M.C. 1437 (4th Cir. 1968). In *Crumady v. Joachim Hendrik Fisser*, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413, 1959 A.M.C. 580 (1959), a nondefective winch's safety device was adjusted so as to render the device ineffective. In finding that an unseaworthy condition resulted, the Court set out its view of a classically unseaworthy condition: "The case is no different in principle from loading or unloading cargo with cable or rope lacking the test strength for the weight of the freight to be moved. In that case the cable or rope, in this case the winch, makes the vessel *pro tanto* unseaworthy." *Id.* at 427–28, 79 S.Ct. at 448, 3 L.Ed.2d at 417, 1959 A.M.C. at 584. *See also Varlack v. Mitsui O.S.K. Lines, K.K.*, 333 F.Supp. 1233, 1972 A.M.C. 808 (E.D.Pa. 1971) (truck exceeded capacity of rigging used to raise it).

Indeed Seacoast does not seriously contest that using nylon mooring line to attempt to move the sunken shrimper constituted an unseaworthy condition. Rather Seacoast argues that Captain Dixon intended to use the lines to pull his vessel close enough to the shrimper to attach the davit lifting cables. Seacoast argues that the use of the mooring lines was similar to use at a dock, was not unreasonably dangerous, and therefore the vessel was not unseaworthy. The record, however, does not support Seacoast's assertion that use of the mooring

lines over a 50-foot distance, not doubled, and in open, turbulent waters is the equivalent of tying up at a dock.[10]

We do not rely on the weakness of that assertion by Seacoast, however, since perhaps its truth was a jury question. Instead, the record as we read it contains additional, uncontroverted facts which refute Seacoast's underlying assumptions. We agree that Captain Dixon testified that he meant to use the mooring lines to approach the shrimper. But it is also uncontradicted that he intended to do so only after testing the shrimper's flotation. It was the use of the mooring lines for that initial purpose—to test flotation—that caused the accident and which created an unseaworthy condition, and no reasonable jury could have concluded otherwise. Thus under the usual *Boeing* reasonable man standard, the unseaworthiness aspect of the directed verdict was proper.

### Jones Act Negligence

The Trial Judge alternatively found Seacoast liable because of the Jones Act negligence of Captain Dixon and those under his command.[11] Captain Dixon testified that he knew the mooring lines would not stand the stress entailed in moving another vessel. It is clear that the recoil of a broken line was within the foreseeable zone of risk. *See In re Dearborn Marine Service, Inc.*, 499 F.2d 263, 277–79, 1975 A.M.C. 1850, 1868–71 (5th Cir. 1974), *cert. dismissed sub nom. Monk v. Chambers & Kennedy*, 423 U.S. 886, 96 S.Ct. 163, 46 L.Ed.2d 118 (1975). The remedial nature of the Jones Act and its imposition of a higher standard of care on employers results in liability upon the showing of only "slight negligence." *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 329, 1977 A.M.C. 1090, 1111 (5th Cir. 1977); *Sanford Bros. Boats, Inc. v. Vidrine*, 412 F.2d

10. Moreover, were the uses truly equivalent, the fact that the line broke would give rise to a strong inference that the apparently seaworthy line was in fact defective and thus, contrary to our assumption, unseaworthy for any use. *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, 1944 A.M.C. 1 (1944) (unseaworthiness where new, apparently nondefective, but actually rotten rope supporting platform broke); *Gibbs v. Kiesel*, 382 F.2d 917

(5th Cir. 1967) (fact that cables failed during ordinary intended use indicates as a matter of law defective condition).

11. We choose to reach this basis of liability even though it is swallowed up by unseaworthiness. *Clevenger v. Star Fish & Oyster Co.*, 325 F.2d 397, 402, 1964 A.M.C. 27, 35 (5th Cir. 1963).

958, 962-69, 1969 A.M.C. 1706, 1710 -20 (5th Cir. 1969). The acts of (i) the *Louisiana* going astern, putting great stress on the mooring lines, and (ii) maintaining that stress until one broke, constituted Jones Act negligence beyond the slightest doubt.[12] As it did with respect to unseaworthiness, Seacoast only argues a view of the facts which the record in no way supports, and does not seriously contest the Trial Judge's finding of Jones Act negligence as such. We find that all of the probative facts support a finding of negligence under the Jones Act. Applying even the severe FELA standard, the directed verdict as to this issue was proper.

### Contributory Negligence

■ Any negligence by Allen would mitigate his recovery under either unseaworthiness or the Jones Act. *Symonette Shipyards, Ltd. v. Clark, supra,* 365 F.2d at 470, 1966 A.M.C. at 2390-91. The Trial Judge emphatically rejected Seacoast's contributory negligence claim, stating (in language more severe than even the FELA standard) that there was "not one scintilla of evidence in the record upon which the jury could base a finding that [Allen] was not keeping a proper lookout for his own safety. . . ." The record shows that when Allen arrived on the bridge it did not appear that the lines were under stress. Allen was on the bridge for three to five minutes prior to being injured, but was not aware of the increasing stress on the lines due to his concern for the cuts on Captain Dixon's legs. Seacoast contends that a jury question was created concerning Allen's failure to protect himself from the danger of a broken line.

■ A captain owes his crew a paternalistic duty to protect them. *Offshore Co.*

*v. Robison,* 266 F.2d 769, 1959 A.M.C. 2049 (5th Cir. 1959); *Vickers v. Tumey,* 290 F.2d 426, 429 32, 1961 A.M.C. 1173, 1177-79 (5th Cir. 1961). The record unmistakeably shows that while Allen was unaware of stress on the lines, Captain Dixon most certainly was aware. Since Allen was standing within a few feet, it would have been a simple matter for Captain Dixon to warn Allen of the danger. Yet Captain Dixon did not even attempt to fulfill that broad duty. "By comparison, the seaman's duty to protect himself (the ground for any countervailing legal interest serving to exculpate the employer) is slight." *Spinks v. Chevron Oil Co.,* 507 F.2d 216, 223 (5th Cir. 1975). *See Nivens v. St. Louis Southwestern Ry.,* 425 F.2d 114, 118-19 (5th Cir. 1970) (FELA case). We agree with the Trial Judge that nothing in the record supports the notion that Allen breached his slight duty to protect himself. Moreover, the captain certainly breached his broad paternalistic duty to protect Allen. Under even the most stringent standard, the Trial Judge properly granted a directed verdict as to this issue.

### Imputing Liability To Seacoast

We must now consider whether Captain Dixon's Jones Act negligence and creation of an unseaworthy condition may be imputed to Allen's employer and the owner of the *Louisiana,* Seacoast. The parties have approached this two-part issue solely from the Jones Act negligence quarter. We, however, consider both unseaworthiness and negligence, concluding that either theory imputes liability to Seacoast.[13]

■ In the Jones Act negligence context, Seacoast vigorously argues that Captain Dixon's salvage operation was a frolic

12. These negligent acts in conjunction with Captain Dixon's choice of lines too weak for the salvage operation constituted the accumulation of negligent acts identified in *Robinson v. Showa Kaiun K.K.,* 451 F.2d 688, 690, 1972 A.M.C. 799, 801 (5th Cir. 1971), and subsequent cases as creating an unseaworthy condition distinct from an isolated act of negligence. Moreover, the stress on the mooring lines was more than a transitory condition. Consequently, separate findings of unseaworthiness and Jones

Act liability are appropriate. *Parker v. S/S Dorothe Olendorff,* 483 F.2d 375, 381 n.4, 1973 A.M.C. 1619, 1625-26 n.4 (5th Cir.), *cert. denied,* 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 110 (1973); *Edynak v. Atlantic Shipping Inc.,* 562 F.2d 215, 221-22, 1977 A.M.C. 2475, 2484-86 (3d Cir. 1977). *But see Campbell v. Seacoast Products, Inc.,* 581 F.2d 98, 99, 1979 A.M.C. 679, 681 (5th Cir. 1978).

13. Because we hold Seacoast vicariously liable, we do not decide Allen's contention that Sea-

of sorts which exceeded the scope of his authority. Leaving aside the question of whether the scope of the authority of a seaman's superior is even relevant where a seaman is injured aboard ship,[14] we hold that Captain Dixon's actions were not and could not have been outside of the scope of his authority. Salvage of both life and property is so encouraged that it is practically a mariner's duty. *See* page 358 *supra.* Not only is salvage the favorite of the common law of admiralty, it is also a statu-torily-approved reason for deviation by a carrier.[15] Nor was the captain's power and responsibility to salve property at sea even limited by policy or actions of Seacoast.[16] Seacoast's argument that Captain Dixon exceeded the scope of his authority by undertaking what the law in all ways encourages—salvage—has the buoyancy of an anchor in water.[17] Because we reject Seacoast's *respondeat superior* argument, we find Seacoast vicariously liable under the Jones Act.

coast's two insurers are liable irrespective of Seacoast's imputed liability under the terms of the insurance policies.

**14.** *Baker v. Baltimore & Ohio R.R.*, 502 F.2d 638, 641 (6th Cir. 1974) (FELA case; the Jones Act incorporates the FELA).

**15.** 46 U.S.C.A. § 1304(4) states:
> (4) Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.

**16.** It is undisputed that Seacoast's operating rules were silent concerning salvage. There were no rules preventing Seacoast vessels from responding to salvage or other unusual situations. Captain Dixon testified that at no time was he aware that the salvage operation was forbidden. Captain Dixon's intent to salvage the shrimper was clear to anyone listening to the Seacoast radio transmissions that day. Several spoter pilots and other Seacoast captains became aware of the pending operation in this manner. It is not clear that the shoreside Seacoast monitoring stations were listening at the time of those radio transmissions, but it is undisputed that no member of the Seacoast "navy" or "air force" thought the operation so unauthorized as to attempt to notify Captain Dixon's landbased superiors. At trial, a Seacoast supervisor testified that he would have stopped the salvage operation had he been informed—but it is clear at the time of the accident that he had not promulgated his policy to anyone involved in the fishing operations.

**17.** In so concluding we have evaluated the evidence using the FELA standard.

The cases upon which Seacoast relies are easily distinguishable. *Petition of Vest,* 116 F.Supp. 901, 1954 A.M.C. 145 (N.D.Cal.1953), was a suit to limit liability after three passengers aboard Vest's charter fishing boat drowned in a collision. The boat's skipper and only crew member had regular daylight working hours, 6:00 a. m. to 4:00 p. m. The accident occurred at night, long after working hours, and after the boat had been docked for the evening. The skipper had taken some friends out on the boat for sightseeing, not for charter fishing. The Court held the employer was not responsible for the skipper's almost felonious voyage. The skipper's authority was clearly limited to daylight fishing trips and the night-time sightseeing voyage did not further the employer's interests in the slightest. Seacoast's other cases, *Trost v. American Hawaiian S.S. Co.,* 324 F.2d 225 (2d Cir. 1963) (seaman's fall through open trap door of shoreside cafe), *cert. denied,* 376 U.S. 963, 84 S.Ct. 1125, 11 L.Ed.2d 981 (1964); *Robinson v. Northeastern S.S. Corp.,* 228 F.2d 679, 1956 A.M.C. 289 (2d Cir.) (seaman injured while being taken back to ship), *cert. denied,* 351 U.S. 937, 76 S.Ct. 834, 100 L.Ed. 1465 (1956); and *Walker v. Sinclair Refining Co.,* 331 F.Supp. 408, 1972 A.M.C. 265 (E.D.Pa.1971) (seaman accidently pushed over roadside obstacle), involved injuries to seaman while ashore and are similarly inapposite.

Those cases involve either a lack of any negligence at all, *see* 2 M. Norris, *supra* § 687, at 362–63, or conduct clearly outside of the authority granted by the employer. Furthermore, other cases involving similar facts but slightly greater authorization have found the employer vicariously liable. *E. g., Hopson v. Texaco, Inc.,* 382 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740, 1966 A.M.C. 281 (1966) (seaman injured in taxicab accident); *Buckeye S.S. Co. v. McDonough,* 200 F.2d 558 (6th Cir.) (seaman injured while being taken back to ship but escort was a customary service), *cert. denied,* 345 U.S. 926, 73 S.Ct. 785, 97 L.Ed. 1357 (1953). *Cf. Moore v. Associated Pipeline Contractors,* 468 F.2d 815, 1974 A.M.C. 712 (5th Cir. 1972) (seaman injured during transportation to union meeting). Most importantly, none of these cases involve salvage or any other favored maritime activity.

■ We alternatively consider vicarious liability for unseaworthiness. The vessel owner's duty to prevent unseaworthy conditions is absolute, continuing, and non-delegable. Lack of knowledge of or opportunity to correct such conditions does not mitigate the vessel owner's duty. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960 A.M.C. 1503 (1960). *See Mahnich v. Southern S.S. Co., supra*; 2 M. Norris, *supra*, §§ 621–22. Indeed the breadth of the owner's responsibility for unseaworthy conditions is well-illustrated by the *Sieracki-Ryan-Yaka-Italia* [18] cases tried before Congress limited that avenue of longshoremen's relief.[19] Frequently, those cases involved unseaworthy conditions created by longshoremen without knowledge of vessel owner, Captain, or crew, and in violation of the stevedore's contract with the vessel owner. Nevertheless, the vessel owner was held responsible for unseaworthiness-induced injuries.[20] *E. g., Bonura v. Sea Land Service, Inc.*, 505 F.2d 665, 1975 A.M.C. 462 (5th Cir. 1974) (safety rigging should have been placed around cargo hatch); *Kyzar v. Vale Do Ri Doce Navegacai, S.A.*, 464 F.2d 285, 1972 A.M.C. 1661 (5th Cir. 1972) (improperly placed boom), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973); *United States Lines Co. v. Williams*, 365 F.2d 332, 1966 A.M.C. 2418 (5th Cir. 1966) (longshoreman obtained defective dunnage which was intended to be thrown out and was stored outside of his working area).

■ Seacoast entrusted Captain Dixon with the performance of its seaworthiness duty while the *Louisiana* was at sea. There is no indication that the selection of Dixon as captain was done carelessly. But because Seacoast's duty is a non-delegable one, the care used in the selection is irrelevant. Captain Dixon's failure to prevent an unseaworthy condition—indeed, his creation of one—is chargeable to Seacoast under this non-delegable responsibility. Rest.2d, Agency §§ 214, 492 & Comments (c) & (g).[21] Based upon its duty to provide a seaworthy vessel at all times, the undisputed facts[22] compel the conclusion that Seacoast is vicariously liable for Allen's injury.

### The Damage Award

■ We finally come to Seacoast's claim that the jury verdict of $240,000 was excessive. We have repeatedly held that the jury's award is not to be disturbed unless so large as to "shock the judicial conscience" or indicate "bias, passion, prejudice, corruption, or other improper motive" on the part of the jury. *E.g., Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554, 556 (5th Cir. 1979); *King v. Ford Motor Co.*, 597 F.2d 436, 445 (5th Cir. 1979). In answer to Seacoast's citation of other cases involving eye injuries, we also repeat that:

> "Comparison of verdicts rendered in different cases is not a satisfactory method for determining excessiveness *vel non* in a particular case and . . . each case must be determined on its own facts."

*Wiley v. Stensaker Schiffahrtsges*, 557 F.2d 1168, 1172 (5th Cir. 1977) (quoting *Fruit*

---

18. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, 1946 A.M.C. 698 (1946); *Ryan Stevedoring Co. v. Pan-Atlantic SS Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, 1956 A.M.C. 9 (1956); *Reed v. S. S. Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448, 1963 A.M.C. 1373 (1963); *Italia Societa etc. v. Oregon Stevedoring Co.*, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732, 1964 A.M.C. 1075 (1964).

19. Longshoremen's & Harbor Workers' Compensation Act Amendments of 1972, § 18(a), Pub.L. No. 92–576, 86 Stat. 1263 (codified at 33 U.S.C.A. § 905(b)).

20. *Ryan* indemnity actions by the vessel owners against the stevedores would frequently permit the vessel owners to recover their damages in such situations, thus defeating the stevedoring contractor's exclusive liability for compensation benefits. The indemnity actions did not affect, and indeed were predicated upon, the vessel owners' initial unseaworthiness liability, however.

21. Imposing vicarious liability on Seacoast under an unseaworthiness rubric involves a number of the considerations relating to the law of salvage which were relevant to the imposition of Jones Act liability.

22. Here, of course, the *Boeing* standard is used to evaluate the evidence.

*Indus., Inc. v. Petty*, 268 F.2d 391, 395 (5th Cir. 1959)). We now proceed to the particular facts of this case.[23]

As of the date of the trial it is essentially undisputed that Allen had lost some $30,000 in wages in the two years since his injury. Unpaid medical expenses of approximately $5,000 were additionally anticipated. Impairment of future earning capacity was, however, a much disputed item. There was evidence that tearing problems in Allen's good left eye made it impossible for him to work in dusty environments. Allen had recovered very little depth perception at the time of trial, though there was some evidence that after a time he might recover up to 75 percent. His peripheral vision was obviously affected, and there was very substantial evidence that this limitation combined with the impairment of his depth perception would prevent Allen from ever returning to his former job. There was testimony from both sides concerning the willingness of employers to hire one-eyed persons. It was also asserted that Allen should not take any job posing substantial risk to his remaining eye. Assuming that Allen's loss of an eye was a total disability, expert testimony established that the present value of Allen's future earnings over a remaining working life of thirty years amounted to between $155,000 and $304,000. Seacoast contested those estimates and now argues that Allen is immediately employable at his previous wages, so that the special damages component of the jury verdict could have been at most $35,-000.

Compensation for pain and suffering, the general damages component, was also a much disputed item. Allen was in excruciating agony for a short period after his accident, perhaps as long as a month afterwards. While he is now essentially free of physical pain, there is ample evidence of his humiliation and emotional suffering from being disfigured for life.[24] The evidence also shows that Allen will experience a number of problems in everyday life, including impairment of recreational activities.[25]

Because the jury's general verdict does not distinguish between the various types of damages, we are at a disadvantage in reviewing the award. We believe it is fair to say that the jury could conclude that Allen's future earning capacity was impaired, though not totally. And the pain and suffering component of the award should have been substantial. It seems reasonably clear that those two items together must have constituted approximately $200,-000 of the jury's $240,000 verdict. But we reject Seacoast's contention that the entire amount was attributable to pain and suffering alone. Considering the extent of Allen's (past and future) pain and suffering and the probability of substantial impair-

---

**23.** The jury was properly instructed that the damage award may include compensation for impairment of future earning capacity, lost wages, medical expenses, and pain and suffering. The jury was also cautioned that the award:

> cannot be governed by sympathy, or prejudice, or any motive whatsoever except a fair and impartial consideration of that evidence, and you must not allow any sympathy that you may have for either party to influence you in any degree whatever in arriving at your verdict.

Seacoast argues that the allegedly excessive verdict resulted from (i) an improper "unit of time" argument during the initial closing by Allen's lawyer, and (ii) Allen's demonstration of the removal and replacement of his artificial eye in front of the jury. The Trial Judge sustained Seacoast's objection to the "unit of time" argument, although Seacoast did not request nor did the jury receive a cautionary instruction (other than the Trial Judge's statement that the argument was improper). As for Allen's demonstration, the Trial Judge did not abuse his discretion in determining that the demonstration's probative value (in showing the daily regimen which Allen must endure) outweighed its prejudicial effect. F.R.Evid. 403; *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1347 (5th Cir. 1978). We find no error of any substance in those two incidents. Moreover, considering the record as a whole, it appears that any prejudice resulting from the incidents was too slight to influence the jury's verdict.

**24.** Cf. *Blanco v. Phoenix Compania De Navegacion, S.A.*, 304 F.2d 13, 1962 A.M.C. 1503 (4th Cir. 1962).

**25.** Cf. *Barger v. Mayor of Baltimore*, 1979 A.M.C. 2660 (U.S.D.Ct.Md.1979).

ment of future earning capacity, we conclude that the award is very generous but not shocking to our conscience. Nor could we direct that it be for a lesser sum than found. *Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033 (5th Cir. 1970). Accordingly, we hold that the verdict was not excessive.

AFFIRMED.