# Weeks Marine, Inc.

## v.

# Robert G. Gillikin

Record No. 921861

January 7, 1994

Present: All the Justices

*James L. Chapman, IV (Melanie Fix; Crenshaw, Ware & Martin,* on briefs), for appellant.

*C. Arthur Rutter, Jr. (Jesse M. Suit, III; Rutter & Montagna,* on brief), for appellee.

JUSTICE LACY delivered the opinion of the Court.

Robert G. Gillikin was employed as an engineer/mechanic by Weeks Marine, Inc. One of Gillikin's fingers was injured when a steel access plate fell on it while he was reaching into an engine room of a small boat to remove the fill cap from one of the engine's expansion tanks. The accident occurred aboard the vessel RONNIE C while it was in navigable waters.

Gillikin sued Weeks Marine to recover for his injuries, asserting a claim for negligence under the Jones Act, 46 U.S.C. app. § 688 (1988), and a claim that the vessel was unseaworthy. Following presentation of evidence by both parties, the trial court granted Gillikin's motion for summary judgment on liability. The case was submitted to the jury on the issue of damages only, and the jury awarded Gillikin $325,000.

Weeks Marine appealed, arguing that the liability issues of seaworthiness, negligence, comparative negligence, and causation should have been submitted to the jury for determination and that the verdict was excessive and not supported by the evidence. For the reasons stated below, we conclude that the trial court erred in granting Gillikin's motion for summary judgment on the issue of liability, and we will remand the case for a new trial.

## I. FACTS

In December 1990, Weeks Marine was awarded a contract by the United States Army Corps of Engineers to remove dredge spoils from the Craney Island Rehandling Basin in Portsmouth. Weeks Marine hired Gillikin on December 28, 1990, and assigned him as an engineer/mechanic to handle any mechanical problems of a dredge and attendant vessels used on the project.

On December 30, 1990, James R. Kelly, Jr., also an employee of Weeks Marine, was operating the RONNIE C, a work boat used in the project. The boat's engine was "running hot." Kelly brought the boat to the derrick where Gillikin was working and asked Gillikin to determine the source of the difficulty. Gillikin boarded the RONNIE C and saw that "steam was going out of the engine rooms everywhere." Gillikin determined that it was necessary to fill the engine's expansion tanks with water in order to keep the engine from burning up.

The engine was surrounded by a housing approximately three feet high, and was covered with a steel access plate. This engine room was accessible by a doorway with steps leading down from the deck. The expansion tanks were mounted on each side of the steps. Each tank had a fill hole on top, with approximately 16 inches between the tops of the tanks and the underside of the steel access plate.

The engine room also was accessible by way of the steel plate. Because the plate weighed approximately 300 pounds, lifting it to access the engine room normally required the use of a hoist attached to a padeye mounted in the center of the plate. On the day of the accident, Gillikin and Kelly manually lifted the plate. Kelly then picked up a wooden fuel sounding stick that was about four to five feet long, one inch thick, and two inches wide. Kelly used the stick to prop the steel access plate open about 12 to 18 inches. Gillikin put his hand in the opening under the steel plate to remove the expansion tank cap. The fuel sounding stick broke and the plate fell, pinning Gillikin's middle finger to the engine room housing.

After his finger was released from the access plate, Gillikin was taken to a hospital emergency room for treatment. Although he returned to work the next day, and worked until the completion of the project, he continued to receive treatment for the injury to his finger.

## II. SEAWORTHINESS

The first issue we consider is whether the trial court properly held that the vessel was unseaworthy as a matter of law. A seaman

who is injured as a result of an unseaworthy condition of a vessel is entitled to recover for his injuries from the owner of the vessel, regardless of whether the owner was negligent. "The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). The essence of the seaworthiness doctrine is "that things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 213 (1963). This standard does not require that every piece of equipment be reasonably fit for whatever use to which it may be put, but only that it be reasonably fit for those tasks for which it was furnished.[1] Therefore, if a specific piece of equipment is employed in an anticipated or intended manner and the equipment fails, whether because it is defective or improperly handled, the vessel may be considered unseaworthy. But the personal, negligent act of a fellow seaman, unforeseen by the shipowner, does not create an unseaworthy condition that imposes liability on the owner for injuries resulting from that negligent act. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 500 (1971).

Determining whether a piece of equipment is unfit for its intended use, thus rendering the vessel unseaworthy, is dependent on the circumstances of each case and, "for this reason, it can rarely be determined that a vessel was unseaworthy as a matter of law." 1B Ellen M. Flynn et al., *Benedict on Admiralty* § 24, at 3-71 (7th ed. 1993). We find this general rule to be applicable here, and hold that a jury issue was presented on the question of whether the vessel was seaworthy. Consideration of this issue by the jury is also dictated by Gillikin's concession that the evidence presented was conflicting as to the intended use of the fuel sounding stick and his additional arguments that the vessel was rendered unseaworthy because it did not have an operational crane to lift the access plate or a sufficient safety

---

[1] Gillikin argues that there is no requirement that the equipment be employed in a manner consistent with its intended purpose as a predicate to a finding of unseaworthiness. This contention is at odds with the language of the cases and with the rationale of the doctrine of unseaworthiness. The sole case relied upon by Gillikin for this contention is *Allen v. Seacoast Products, Inc.*, 623 F.2d 355 (5th Cir. 1980), in which a seaman was injured when a nylon line snapped while being used to tow a partially submerged shrimp boat. The line was normally used for mooring and normally was doubled when so used. The court's rationale was that the misuse of otherwise seaworthy equipment can create an unseaworthy condition. *Id.* at 360-61. If the proposition asserted by Gillikin was addressed in *Allen*, it was by implication only, and we are unpersuaded that such a treatment of this issue negates the longstanding principles of unseaworthiness discussed above.

device to hold the plate in an open position.[2] Accordingly, we will reverse that portion of the trial court's summary judgment holding that the vessel RONNIE C was unseaworthy as a matter of law.

## III. NEGLIGENCE AND PROXIMATE CAUSE

Based on our review of the record, we conclude that the trial court also erred in failing to submit the issues of negligence, comparative negligence, and causation to the jury.

Gillikin testified that he knew that the stick was normally used for sounding the fuel tanks, that the steel plate was "pretty heavy," and that the stick was not "the best thing to use" to prop open the access plate. Gillikin knew that there was another access to the tanks but he did not go into the room because the "steam was coming [out] everywhere" and came out of the hatch when the access plate was raised. Kelly testified that both he and Gillikin raised the access plate; that steam was not coming out of the engine room; but that they saw steam inside when they opened the door to the engine room. Gillikin made the decision that water should be added to the expansion tanks, but he testified that it was Kelly's decision to raise the access plate.

Gillikin contends that the operative negligent act was performed by Kelly when he used the wooden stick to support the heavy access plate. In contrast, Weeks Marine argues that a jury could conclude that the operative negligent act was performed by Gillikin when he reached for the expansion tank and placed his hand into the opening under the access plate, knowing that only a wooden stick supported the heavy steel plate. At the very least, Weeks Marine argues, the evidence presented could support a jury finding that Gillikin's actions constituted comparative negligence. Weeks Marine and Gillikin also assert different conclusions as to causation based on their respective views of the operative negligent act.

■ We conclude that jury issues were raised by the evidence presented on the issues of negligence, comparative negligence, and causation. Accordingly, we will vacate the summary judgment entered by the trial court on those issues and remand the case for a new trial on the liability issues.

---

[2] Gillikin also argues that Kelly's decision to use the wooden stick to prop open the metal plate rendered the vessel unseaworthy as a matter of law. This argument, however, as Weeks Marine notes, implicates a single act of operational negligence which could not create an unseaworthy condition. *Usner,* 400 U.S. at 500.

## IV. DAMAGES

■ Weeks Marine also assigned error to the amount of the verdict and to the trial court's ruling allowing the jury to consider the stomach ulcer Gillikin developed a few months after the injury in determining the damage award. In light of our disposition above, we need not address the former issue, but will address the latter, since it may arise on remand. The record shows that the development of Gillikin's ulcer was the result of a combination of causes including his cigarette smoking, his history of stomach ulcers, and his use of ibuprofin, the active ingredient in the medicine he was taking for the pain which resulted from the injury to his finger. The medicine was not prescribed by Gillikin's physicians, but was an over-the-counter medication. Since the record contains evidence linking the ulcer to the pain medication, we find no merit in Weeks Marine's contention that the jury was not entitled to consider the ulcer in assessing damages solely because the medication was not prescribed by the physicians who treated the injury, and we will not preclude the introduction of such evidence on remand.

For the reasons stated, we will reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*