Lester P. COMEAUX, Sr.,
Plaintiff-Appellant,

v.

T. L. JAMES & COMPANY, INC. and
Highlands Insurance Company,
Defendants-Appellees.

No. 79–2127.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Jan. 28, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Brumfield & Brumfield, H. Alva Brumfield, III, Sylvia Roberts, Baton Rouge, La., for plaintiff-appellant.

Francis Emmett, New Orleans, La., for defendants-appellees.

Before BROWN and POLITZ, Circuit Judges [**].

JOHN R. BROWN, Circuit Judge:

Lester Comeaux sued his employer, T. L. James & Co., Inc., for injuries sustained from two successive accidents while working aboard a dredge and its tender vessels. Appealing a judgment based on a jury verdict in his favor, Comeaux complains of the denial of his motion for a directed verdict and a new trial, the exclusion of evidence, prejudicial conduct by the court, misleading and insufficient jury instructions, and insufficient evidence to sustain certain jury findings. Having determined that Comeaux was entitled to a directed verdict on the issue of unseaworthiness, we reverse in part and remand.[1]

### The Facts

Lester Comeaux was employed by T. L. James & Co. as a mate on the dredge ARMADILLO, located off the coast of Mississippi at Bayou Cadet. As part of his duties, he normally supervised a crew of three deckhands and two boathands in maintaining the pontoon lines. The pontoon line, a 22 inch diameter floating discharge pipeline, is mounted above floating cylinder tanks with a catwalk built over it. The line has lights, battery powered, at approximately 50 foot intervals, to warn other vessels of the presence of the line and to aid the crew in making sure that the line has no bends. As the dredge moves forward, the line must be kept relatively straight and with sufficient slack to prevent it from breaking. To perform his duties, Comeaux made use of two work boats, the MISS FRANCES and the BEN JAMES.

On October 2, 1977, upon reporting for work at 11:00 p.m., Comeaux discovered he had no boathands or deckhands to assist him in his duties, as these other crew members had quit the previous day. The prior shift had prepared the pontoon lines with sufficient slack for the dredge to continue moving forward for approximately three hours. Comeaux was also advised by the prior shift that the lights on the pontoon line were out. Because of the rough weather and lack of crew, Comeaux told his immediate supervisor, the leverman, that dredging operations should be suspended until he could secure some help in maintaining the pontoon lines. The leverman told Comeaux to go do his job, and rather than waking the crew from the previous shift, to get the galleyhand, Larry Tucker, to assist

[**] Due to his death on May 15, 1981, Judge Gewin did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d)

1. Because of our disposition of this case, we do not find it necessary to address all of the errors asserted by Comeaux. We treat only those of unseaworthiness and the exclusion of the deposition of Captain Kidder.

him. Tucker had no experience as a deckhand or boathand and in addition was blind in one eye.

Sometime between 2:00 and 3:00 a. m. the slack in the pontoon lines as arranged by the prior crew was no longer sufficient and Comeaux determined that more line would have to be pulled in order to keep up with the dredge. Since the nonfunctioning battery powered lights on the line were necessary to see the line for pulling, Comeaux and Tucker proceeded to take the MISS FRANCES out to replace the batteries. This could be done by holding or putting the vessel against the cylinder and having a crew member alight and replace the batteries, while another crew member controlled the vessel. Since Tucker, afraid of falling overboard, refused to change the batteries, Comeaux piloted the MISS FRANCES to the pontoon lines, positioned the bow against the cylinder, put it in forward gear, and instructed Tucker to hold the wheel as steady as possible while Comeaux attempted to replace the batteries.

While Comeaux was changing a battery, Tucker either moved the wheel or tampered with the controls causing the MISS FRANCES to move forward. This movement caused Comeaux to lose his balance and fall on his back. He was almost killed when the bow of the boat ran over him with Tucker, the inexperienced galleyhand, at the wheel. After running the MISS FRANCES back to the dredge and reporting the accident, Comeaux was subsequently transferred to the hospital in Bay St. Louis, Mississippi, where he was treated for a contusion and tenderness over the lower lumbar and sacral area by Dr. Phillips.

Comeaux, in considerable pain, continued to work for several more days until the job at Bayou Cadet was finished and the dredge moved to the mouth of the Pearl River where the pontoon lines were prepared for towing to another location. It is at this time that Comeaux allegedly suffered a second injury to his back. Apparently Comeaux and his crew were fastening the pontoon lines together when the BEN JAMES rammed into the line and knocked Comeaux and two deckhands overboard. Comeaux asserted that the second accident was caused by a defective throttle on the BEN JAMES.

According to Comeaux, following this second accident, he returned to the dredge and reported the incident to Glenn Trahan, Assistant Safety Engineer, and Captain Kidder. Comeaux left work and shortly thereafter consulted an orthopedic specialist, Dr. Longnecker, in Biloxi, Mississippi, and Dr. Morse, an associate of Dr. Longnecker. After two operations on his back, Comeaux continues to suffer pain and is unable to perform work requiring heavy lifting or bending.

### In the District Court

On February 1, 1978, Comeaux brought suit against his employer, T. L. James (James), and its insurer, Highlands Insurance Co. (Highlands) under the Jones Act, 46 U.S.C. § 688 and General Maritime Law claiming a ruptured disc resulting from these two accidents, each of which was brought about by the negligence of James, the unseaworthiness of the dredge and the two tender vessels, or both.

At trial, evidence of the first accident and the circumstances surrounding it was presented in the form of testimony by Comeaux and by the deposition of Larry Tucker, the galleyhand. As to the second accident, the evidence consisted of testimony by Comeaux and the depositions of three eyewitnesses, Ricky Mitchell and Jesse Parker, two crew members working with Comeaux on the pontoon lines, and Thomas Bailey, a crew member on board the BEN JAMES. Several doctors, both in person and in the form of depositions, testified as to the nature and extent of Comeaux's injuries. James presented only two witnesses, Glenn Trahan, a safety engineer employed by it, and Gerald Busich, an insurance adjuster. Their testimony focused largely on the second accident and attempted to establish the nonexistence of this accident. James' theory that no second accident occurred was based on the lack of an accident report, Comeaux's alleged failure to mention the

second accident to the insurance adjuster or to his doctors, and the differing dates and time of day given for the accident by the witnesses. Trahan also was questioned on the acceptable procedures for changing the battery for pontoon lights.

The case was submitted to the jury under F.R.Civ.P. 49(a) with a general charge and special interrogatories covering each accident, under both Jones Act negligence and unseaworthiness.[2] As to the first accident, the jury found Jones Act negligence on the part of James and no unseaworthiness of either the dredge or the workboat MISS FRANCES as proximate cause. The verdict fixed damages in the amount of $150,000 but the jury determined that Comeaux was contributorily negligent to the extent of 75%. The jury made a finding that no second accident had occurred. Judgment was entered in the amount of $37,500 ($150,000 reduced by 75%). Comeaux's motions for j.n.o.v., new trial, and additur were denied.

### Asserted Errors

On appeal, Comeaux's primary contention is that the District Court should have granted a directed verdict on the issue of unseaworthiness in the first accident. Also, Comeaux asserts that there is no evidence to support the finding of contributory negligence as to that accident. As to the second accident, Comeaux argues that the jury's finding is contrary to the evidence. Additional errors are urged based on exclusion of evidence, questioning of experts by the court, instructions to the jury, and actions of the defense counsel.

James' primary response as to unseaworthiness in the first accident is that since Comeaux received a verdict in his favor on the Jones Act case the issue of unseaworthiness is of no consequence. It is "like winning a football game 7 to 0 versus 14 to 0." James asserts that there is sufficient evidence to sustain the finding of 75% contributory negligence and that such finding would apply both to the claim of Jones Act negligence and to unseaworthiness.

As to the second accident, James asserts that there was sufficient evidence to sustain the jury finding (Int. No. 8) that no accident occurred. This took the form of (1) the variation in the testimony as to the time and date given for the accident by the eyewitnesses, (2) Comeaux's failure to recall the exact date of the alleged second accident, (3) his failure to mention the second

2. The interrogatories and answers were:

1. Was there any negligence under the Jones Act on the part of the defendant in the first accident which was the cause of plaintiff's injuries?
   Yes _X_ No_____

2. Was there any unseaworthiness of the dredge ARMADILLO in the first accident which was the proximate cause of plaintiff's injuries?
   Yes_____ No _X_

3. Was there any unseaworthiness of the M/V BEN JAMES in the first accident which was the proximate cause of plaintiff's injuries?
   Yes_____ No _X_

4. Was there any unseaworthiness of the M/V MISS FRANCES in the first accident which was the proximate cause of plaintiff's injuries?
   Yes_____ No _X_

If the answers to Questions 1 through 4 are all "no", please go to Question 8. Otherwise proceed to Question 5.

5. What amount of damages, if any, expressed in dollars, did plaintiff sustain as a result of the first accident?
   $ _150,000.00_

6. Was there any negligence on the part of the plaintiff in the first accident which was the proximate cause of his own injuries?
   Yes _X_ No_____

7. If the answer to Question 6 is "yes", by what percentage did the plaintiff's negligence contribute to his own injuries in the first accident?
   _75%_

8. Did the plaintiff sustain a second accident while in the defendant's employ following the accident he sustained on October 2, 1977?
   Yes_____ No _X_

If the answer to Question 8 is "no", please date and sign this form and return to the courtroom. Otherwise proceed to Question 9.

Questions 9–15 were unanswered since the jury answered "no" to question 8. These questions dealt with whether there was any negligence or unseaworthiness that contributed to the second accident, the allocation of fault, and the amount of damages that plaintiff sustained from the second accident.

accident to his treating physicians and the insurance adjuster and (4) the testimony of Trahan that plaintiff had not reported a second accident. Comeaux testified that he reported the second accident to Trahan and also to Captain Kidder. Kidder was sworn as a witness by the court but was released by James without leave of court and therefore not available to Comeaux as a rebuttal witness to Trahan's testimony that Comeaux never reported the second accident. Comeaux asserts that the District Court erred in subsequently excluding as rebuttal testimony Kidder's pretrial deposition in which he stated that the accident had been reported to him (Kidder).

Finding that Comeaux was entitled as a matter of law to a directed verdict on the issue of unseaworthiness in the first accident, we reverse in part and remand. While we affirm the finding of Jones Act negligence and 75% contributory negligence as to the Jones Act claim in the first accident, contributory negligence for purposes of Jones Act negligence is not necessarily equivalent to that when the basis for liability is unseaworthiness and thus must be retried. Since retrial on the question of possible contributory negligence in the unseaworthy claim will virtually require a whole new trial, we find as to the second accident that at the minimum the District Court should have allowed the use of Kidder's deposition on the issue of the occurrence of a second accident. Consequently the adverse finding (Int. No. 8) must be set aside. Since the only direct evidence of the nonoccurrence of the second accident is the testimony by Trahan that Comeaux never reported an accident to him, the testimony of Kidder as to knowledge that a second accident had happened becomes crucial either as possible impeachment of the only evidence by James or affirmative proof of the fact of notice.

We find it unnecessary because of this disposition to discuss the other errors asserted by Comeaux which are not likely to occur upon retrial.

### Standard of Review

■ The general standard of review for motions for directed verdict is well established in this Circuit.[3]

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and the inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper.... A mere scintilla of evidence is insufficient to present a question for the jury.

*Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc). The *Boeing* standard is appropriate for unseaworthiness claims. *Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 359 (5th Cir. 1980); *Claborn v. Star Fish & Oyster Co.*, 578 F.2d 983, 987, 1979 A.M.C. 636, 642 (5th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1281, 59 L.Ed.2d 494 (1979); *Robertson v. Douglas S. S. Co.*, 510 F.2d 829, 833, 1975 A.M.C. 1021, 1028 (5th Cir. 1975); *Shephard v. S/S NOPAL PROGRESS*, 497 F.2d 963, 967 (5th Cir. 1974), *cert. denied*, 420 U.S. 937, 95 S.Ct. 1147, 43 L.Ed.2d 414 (1975). From the evidence adduced at trial we find that reasonable men could not have arrived at a verdict contrary to the finding of unseaworthiness.

### The First Accident—Unseaworthiness Claim

■ General maritime law imposes a duty on a ship owner to provide a seawor-

---

**3.** We have indicated that the *Boeing* standard does not apply to Jones Act claims which permit the more lax FELA standard. *See Allen v. Seacoast Products, Inc.*, 623 F.2d 355, 359–60 (5th Cir. 1980). Under the FELA standard, a directed verdict is possible "only when there is a complete absence of probative facts" supporting the nonmovant's position. The jury finding (Int. No. 1) of negligence is well above this submerged Plimsoll line and we affirm this and the related 75% contributory negligence finding (Int. No. 7) as to Jones Act negligence.

thy vessel. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 549, 80 S.Ct. 926, 932, 4 L.Ed.2d 941, 947–48 (1960); *Smith v. Ithaca Corp.,* 612 F.2d 215, 219 (5th Cir. 1980); *Hlodan v. Ohio Barge Line, Inc.,* 611 F.2d 71, 74 (5th Cir. 1980); *Weeks v. Alonzo Cothron, Inc.,* 466 F.2d 578, 581 (5th Cir. 1972). The warranty of seaworthiness includes a seaworthy crew and the ship owner's duty is breached by providing a "defective" or inadequate crew. "Of course, to be inadequate or improperly manned is a classic case of an unseaworthy vessel." *June T., Inc. v. King,* 290 F.2d 404, 407 (5th Cir. 1961), 1961 A.M.C. 1431. *See Boudin v. Lykes Bros. S.S. Co.,* 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); *Vallot v. Central Gulf Lines, Inc.,* 641 F.2d 347, 350 (5th Cir. 1981); *Moschi v. Steamship Edgar F. Luckenbach,* 424 F.2d 1060, 1061 (5th Cir. 1970); *Clevenger v. Star Fish & Oyster Co.,* 325 F.2d 397, 400 (5th Cir. 1963).

There is no question in this case that the MISS FRANCES was unseaworthy due to an inadequate crew. Not only was the crew insufficient in number, but the one crew member, Tucker, was totally inexperienced and blind in one eye.[4] It is also undisputed that Comeaux undertook this task with Tucker as his assistant only upon the order of the leverman. There simply is no evidence from which a jury could possibly fail to find the vessel unseaworthy due to "defective" crew. We can only speculate that the jury somehow viewed the accident as caused by Comeaux's assuming the risk of an unseaworthy crew, which as a matter of law is error.[5] "While the seaman does assume the risk of those perils of the sea which are inescapable, no risk that can be reasonably controlled by the ship owner is assumed by the seaman. No matter how glaring the negligence of the seaman that may be said to have contributed to his injury, assumption of risk never rises to the level of even a partial defense." *Reyes v. Vantage S. S. Co.,* 558 F.2d 238, 244 (5th Cir. 1977), *modified on rehearing,* 609 F.2d 140 (5th Cir. 1980).

Contributory negligence is not ordinarily a defense under a claim of unseaworthiness but relates only to the diminution of damages. *Socony-Vacuum Oil Co. v. Smith,* 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939); *Allen v. Coast Products, Inc.,* 623 F.2d 355, 362 (5th Cir. 1980); *Hlodan v. Ohio Barge Line, Inc.,* 611 F.2d 71, 74 (5th Cir. 1980). In this case, James presented no evidence directly related to contributory negligence of Comeaux as to the unseaworthiness claim, other than Comeaux's investigatory statement that his injury was caused by an accident.[6] A possible other basis for a finding of negligence

---

4. If a dredge is unseaworthy or guilty of negligence in sending an inexperienced and novice seaman out on a pontoon line without a life vest, it is obvious that such a person would also be incompetent to operate a small boat like the MISS FRANCES on a similar mission. *See Davis v. Parkhill-Goodloe Co.,* 302 F.2d 489 (5th Cir. 1962), 1962 A.M.C. 1720.

5. In closing arguments, counsel for James spoke directly in terms of assumption of the risk:

There is no mention of another accident, none. There is no written evidence anywhere to support this, and I tell you this needed to be invented because on the first case there is no liability. The plaintiff lost his balance in known sea conditions which a seaman is expected to work in. He knows. He assumes the risk of his trade. That's what it is.

6. In a statement from Comeaux taken by Investigator Busich after the accident, the following occurred:

BUSICH: Would you deem your accident just merely an accident, or would you put the blame on anybody specifically?

COMEAUX: It was just an accident, short of men. That was all.

In closing arguments, counsel for James amplified this:

I say there's no second accident. What is the motive that propels the second accident? It's an attempt to get money, because the first accident, on its merits, will not bring in a verdict of liability. No one is at fault for the first accident. You heard Mr. Comeaux, before any lawyers were involved, fairly questioned by, formerly a school teacher, an adjuster that has no interest in this cause. Mr. Comeaux said very clearly to you, said he fell because he lost his balance. He said at the end of his statement that this was nothing more than an accident.

on Comeaux's part that would relate to the unseaworthiness claim is the testimony of Trahan as to the safest way to position the MISS FRANCES to change the batteries. However, a seaman has no duty to find the safest way to perform his work. "His duty is to do the work assigned, not to find the safest method of work." *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 223 (5th Cir. 1975), *clarified*, 546 F.2d 675 (5th Cir. 1977). In cross-examination, Trahan admitted that under the safety regulations, Comeaux's positioning of the MISS FRANCES with the bow against the pontoon cylinder, instead of the pipeline, was acceptable.[7]

Given a directed verdict instructing that the MISS FRANCES was unseaworthy and the evidence from Trahan speaking for James that both positions for changing the batteries were acceptable, we cannot assume that the jury's answer would be the same as in the simpler case of negligence.

### The Second Accident—The Disappearing Witness

■ James' primary defense to the second accident was that the accident itself never occurred. The only direct evidence that no accident occurred was in the form of testimony of Trahan that Comeaux never reported the accident. Comeaux had testified that he reported the incident to Trahan and to Captain Kidder. At the beginning of the trial Kidder was put under oath and sequestered with other witnesses, and most importantly, given positive instructions to "remain outside the courtroom . . . until you have been excused and discharged by the court."[8] The Captain mysteriously was unavailable when Comeaux attempted to call him as a rebuttal witness without counsel for James ever having moved the court in the presence of Comeaux's counsel to release Kidder as a witness. The record establishes that counsel for James, *on his own*, without the authority of the court or notice to counsel for Comeaux, excused Captain Kidder. Kidder's departure prior to being released *by the court* was a violation of the court's instructions by the witness himself, done not only with full acquiescence of counsel for James, but, as the record reveals, on the express permission if not instruction of counsel for James. When Comeaux's counsel attempted to use Kidder's pretrial deposition, the District Court refused since Kidder was within the subpoena power of the court.[9]

7. This was the climax of the exchange between Comeaux's counsel and Trahan:
   Q. So, according to the regulations or safety practices that you were discussing, either position is acceptable according to the safety regulations?
   A. If the vessel is made fast to the tank.
   Q. Thank you.
   A. And in calm water.
   THE COURT: And what?
   A. In calm waters. It is recommended that the latter procedure be used in rougher waters.

8. The District Court judge gave the following instruction to witnesses:
   All right. With the exception of Mr. Comeaux, the rest of you are to remain outside of the courtroom, outside of the hearing of the court, not to discuss the case with anyone, including each other, until you have been excused and discharged by the court. You're to remain outside.
   While the transcript itself does not name the witnesses who were instructed and sequestered, the colloquy between counsel and the District Court after James rested clearly indicates that Captain Kidder was among those sworn as witnesses, instructed to remain outside until excused *by the court*, and present. At oral argument, after our repeated inquiries of counsel for James, it was admitted that Captain Kidder was "subject to being called" and that counsel for James had not moved the court in the presence of counsel to release Captain Kidder.

9. The following exchange between Comeaux's counsel and Kidder in Kidder's deposition supported Comeaux's contention on the critical issue that he had in fact reported the second accident to Kidder.
   Q. Do you remember Lester telling you he was on the pontoon line and the BEN JAMES hit it and knocked him down on the cylinder and hurt his back?
   A. Yes, he mentioned that to me.
   Q. Did he tell you who was operating the BEN JAMES?
   A. Yes.
   Q. Who?
   A. It was Hagan.
   On cross-examination some question was raised whether this report to Captain Kidder was before or after Comeaux went to the doctor.

F.R.Civ.P. 32(a)(3) governs the use of depositions in court proceedings. "The deposition of a witness, . . . may be used . . . if the court finds: (E) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used." We find that this section, in the interest of justice, provided sufficient basis for allowing the deposition of Kidder whose live testimony was then made unavailable, in part through the action of counsel for James. Kidder had not been released by the District Court in open court and counsel for James had no authority to release the witness. Kidder's testimony was not merely cumulative corroborative evidence. It was a direct denial of the testimony of Trahan, thus impeaching him (Trahan) *and* tending to prove the opposite, that is, a report of the second accident. Under these circumstances, coming near the close of trial and resulting both from the violation of the court's instruction by the witness and from the unauthorized instruction of counsel to one of James' employees, the District Court, at the minimum, should have admitted the deposition. If the District Court did not believe that the interest of justice required the use of the deposition, the District Court should have delayed the trial until Kidder could be subpoenaed and his presence secured. The action of counsel for James here is certainly one we do not condone and counsel's response that the plaintiff had "had his day in court" simply does not justify secretly releasing a witness and then successfully moving to keep his deposition out of the trial. Since Captain Kidder's testimony, either in person or by deposition, was crucial to the one piece of direct evidence presented by James concerning the nonoccurrence of the second accident, the entire issue of the second accident must be retried.

*Wrapping it Up*

Because of the confusion created by two separate theories of liability for two separate accidents, we here summarize our holding and directions on remand. As to the first accident, we affirm the finding of negligence under the Jones Act claim (Int. No. 1) and the finding of 75% contributory negligence as to the Jones Act claim (Int. No. 7). We hold that under the unseaworthiness claim in the first accident Comeaux was entitled to a directed verdict. The jury found that Comeaux sustained damages of $150,000 as a result of the first accident (Int. No. 5). In determining the amount of damages sustained in the first accident, the interrogatory, as written did not, and rightly so, ask the jury to separate those damages resulting from negligence as opposed to those resulting from unseaworthiness [10]. Thus, we must sustain the finding of $150,-000 damages in the first accident under either theory of liability. While Comeaux was entitled to a directed verdict on unseaworthiness, part of this claim must be remanded, that concerning contributory negligence. Because negligence on the part of Comeaux under a theory of unseaworthiness is not necessarily equivalent to contributory negligence under a Jones Act theory, the jury must determine the percentage of negligence contributed by Comeaux under the unseaworthiness theory, which percentage, if any, would permit the judge to reduce Comeaux's recovery. The District Court on remand should make sure that the affirmed finding of 75% contributory negligence in the Jones Act claim is not determinative of the percentage of negligence of Comeaux under the unseaworthiness claim.

As to the second accident, we hold that the exclusion of the deposition of Kidder was a critical error requiring a new trial on all aspects of this incident.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

---

**10.** Interrogatory 5 very sensibly did not speak in terms of damages resulting from negligence (if found by the jury). Rather, it spoke in understandable operational terms of the occurrence, i.e. "the accident".