**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 95-21021

Gabriel Israel Bonefont,

Plaintiff-Appellee,

VERSUS

Valdez Tankships Corporation and
Maritime Overseas Corporation,

Defendants-Appellants.

Appeal from the United States District Court
For the Southern District of Texas
(CA-H-94-1232)

January 9, 1998

Before JOLLY, SMITH, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:[*]

The plaintiff-appellee, Garbriel Israel Bonefont, formerly a member of the crew of the S/T OVERSEAS VALDEZ (VALDEZ), brought the instant action against the owner of the VALDEZ, Valdez Tankships Corporation, and the operator of the vessel, Maritime Overseas Corporation, both defendants-appellants herein, alleging that he

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

sustained injuries aboard the VALDEZ as a result of the defendants' negligence under the Jones Act (46 U.S.C. App. §688) and/or the unseaworthiness of the VALDEZ. All parties consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). After a four day trial, without a jury, the court found that the negligence of the defendants and the unseaworthiness of the VALDEZ caused the plaintiff's injury. In addition, the trial court found that the plaintiff was not contributorily negligent under either the Jones Act or the general maritime law of unseaworthiness. The trial court entered judgment awarding the plaintiff damages. The defendants appealed, contending that the Magistrate Judge committed clear error in finding negligence, unseaworthiness and in finding no contributory negligence on the part of Mr. Bonefont. The defendants also assert that the damages awarded were excessive. Additionally, the defendants appeal the Magistrate Judge's denial of their motion for new trial on the basis of fraud and her denial of their motion for discovery pending appeal. Finding no error, we affirm.

## Background

At the time of the accident which gave rise to this litigation, December 14, 1993, the plaintiff, Gabriel Bonefont, was forty-eight years old and had been a seaman for thirty-one of those years. Mr. Bonefont held a Z-card license from the United States Coast Guard which rated him as an unlimited able-bodied seaman, commonly called an AB, and qualified him to serve on any vessel.

2

An AB is the lowest licensed rating a seaman can hold. Except for one voyage, Bonefont worked as an AB during his thirty-one years.

In December 1993, Mr. Bonefont was engaged as an able-bodied seaman aboard the S/T OVERSEAS VALDEZ (VALDEZ), a 700 foot 26,000 ton tanker owned by Valdez Tankships Corporation and operated by Maritime Overseas Corporation. The plaintiff obtained his employment aboard the VALDEZ via his union's hiring hall. At this time, Mr. Bonefont was a member of the Seafarers' International Union which operates a hiring hall by posting employment opportunities aboard ships and allowing qualified seaman to sign-on to the ship of their choice with priority going to the seaman with the most seniority in the union.

On December 14, 1993, the VALDEZ was docked at Corpus Christi, Texas taking on stores and preparing to undertake a coast-wise voyage with a cargo of oil. After working his regular midnight to 4:00 a.m. shift, the plaintiff agreed to work overtime loading stores into the ship's hold. The plaintiff was directed to assist in the off-loading of large 20 foot steel pipes weighing approximately 900 pounds each. The pipes were to be used in making repairs to the ship while en route.

The loading of 20 foot long steel pipes weighing approximately 900 pounds was not a routine undertaking. It involved off-loading the pipes from a barge moored along side of the ship onto the VALDEZ's deck at midship using a manually-operated boom and a mechanical winch to which a sling was attached. In this case, the pipes were to be taken off the barge and placed on the deck two at

3

a time stacked one on top of the other. The pipes, however, were not bound together.

A total of six crewman were assigned to this task. The loading procedure's complement consisted of one crewman operating the mechanical winch which was located fifty feet from the loading area at midship. In addition, two crewman held the boom guides and two crewman, Bonefont and another AB, Michael Duggan, guided and stabilized the actual load onto the deck. Duggan and Bonefont were instructed to manually hold the ends of the pipes as they were lowered into place. The final crewman assigned was the boatswain who was in charge of the loading operation but was not a permanent employee of the VALDEZ and had been assigned to the ship in a relief capacity two months before the accident.

In order to oversee and direct the entire operation, the boatswain positioned himself in such a way as to give orders to both the winch operator and Bonefont and Duggan. In this case, the boatswain's positioning was especially important because the winch-man was operating blind in that he could not see the area into which he was placing the pipes. However, because of the distance between the winch operator and the off-loading site and the noise generated by the winch itself, the boatswain could not communicate orally with the winch operator and relied exclusively on hand signals. Of importance in this matter, "[t]he hand signal to the winch operator for 'go slow' involves raising one's hand with fingers and thumb down and opening and closing the hand with fingers and thumb touching in a pincher-like motion. To indicate

4

by hand the command to speed up the winch, the motion involves raising one's hand, pointing the index finger down and rotating that finger."[2]   While these hand signals are regularly used in broad daylight, the loading operation in question began at the pre-dawn hour of 5:24 a.m., while it was still dark.  "[A]t night," the same orders usually given by hand "are normally accomplished with flashlight signals in a different manner."  The reason being that "[i]n the pre-dawn darkness of early morning, both hand signals look similar to each other."  "Given the winch operator's obstructed line of sight with respect to the load and the poorly-lighted area in which he worked, the boatswain could have and should have used the alternative flashlight signals to accurately convey his directions."

The loading process began with the boatswain signaling to the winch-man to lift the pipes off the barge and over the deck's railings.  The two boom guide crewman then positioned the pipes over the deck at midship.  The pipes were positioned so that they could be lowered onto the deck in the middle of a ten foot area between the deck rails and the manifold pan.  The manifold pan is a three feet high, twelve feet long and five feet wide steel drip-pan located on the deck and used to catch oil and other "slushes" from the manifold.  Once the two pipes were placed into position, the boatswain directed the winch-man to lower the pipes to approximately three to four feet off the deck and then ordered

---

[2]All quotations found in the opinion, unless otherwise noted, are taken from the trial court's Findings of Fact and Conclusions of Law with citations to the record omitted.

5

Bonefont and Duggan to stabilize the load.

After the pipes were stabilized above the deck, the boatswain motioned for the plaintiff to position himself in the middle of the pipes, by the sling, and orally instructed him to be ready to unhook the load. In compliance with his orders, Bonefont moved into position between the pipes and the manifold pan. The boatswain then signaled to the winch-man who dropped the 1800 pounds of pipes rapidly to the deck. Both Duggan and Bonefont were surprised at the swift speed with which the massive pipes fell and they simultaneously attempted to stand clear of the load. Duggan, whose movement was unimpeded, was able to move clear of the pipes. Bonefont, however, had been placed by the boatswain between the pipes and the manifold pan such that the pan was only three to four feet behind him. "Before Mr. Bonefont could move clear of the rapidly shifting load, the top pipe of the two vertically stacked pipes rolled over toward him and landed on his right foot, crushing it. The manifold [pan] blocked his escape." The plaintiff was immediately taken to the hospital in Corpus Christi for emergency care.

Subsequent to the accident, Mr. Bonefont began receiving regular treatment for his injured foot. Eventually, the plaintiff entered the care of Dr. William Donovan who had at the time over twenty years of experience in handling industrial injuries. Dr. Donovan diagnosed Bonefont as suffering from two nerve conditions: 1) Tarsal Tunnel Syndrome, an impingement of the posterior tibial nerve and 2) Morton's neuroma, a tumor on the nerve. These

conditions resulted in pressure being placed on the nerve in two different areas of the foot causing pain and numbness. Dr. Donovan testified that both conditions were a consequence of Mr. Bonefont's foot being crushed on December 14, 1993. The injury resulted in Mr. Bonefont's partial disability, despite his submission to foot surgery and physical therapy. Dr. Donovan opined that although Mr. Bonefont, could do some types of work, he was unfit to return to duty at sea. In fact, Mr. Bonefont did attempt to return to sea following his surgery but was unable to complete his voyage due to the pain in his foot.

Following the accident, Mr. Bonefont filed the instant complaint alleging that he was entitled to recover from the defendants for the injury to his foot under two theories of liability, *viz*. Jones Act negligence and/or the general maritime law of unseaworthiness. In response, the defendants-appellants contended that the incident did not result from any negligence on their part or because of unseaworthiness of the VALDEZ and that, alternatively, any injury suffered by the plaintiff-appellee was solely the result of his own negligence.

At a four-day non-jury trial, the Magistrate Judge in this matter heard testimony and took evidence concerning the pertinent facts surrounding the accident of December 14, 1993 aboard the VALDEZ and the damages sustained by the plaintiff. The trial judge found, *inter alia*, that the plaintiff had never loaded heavy pipes such as the ones involved in this matter before December 14, 1993 and that he "had no indepth knowledge or experience in the proper

7

way to load piping." Furthermore, the Magistrate Judge also found that "neither the boatswain nor other proper ship personnel" offered or provided the plaintiff with any training or instruction as to how to handle these pipes during this particular loading operation. In addition, the trial court found that the boatswain was in charge of the loading of the pipes such that all of the plaintiff's actions, including his positioning between the manifold pan and the pipes, were taken pursuant to direct orders from the boatswain. As to damages, Dr. Donovan recounted the treatment received by the plaintiff and tendered his "unchallenged opinion" that the cause of the plaintiff's nerve injuries was the trauma he suffered aboard the VALDEZ. The defendants-appellants proffered evidence in an attempt to paint a different version of the facts surrounding the accident but did not offer any testimony to counter Dr. Donovan's opinion as to causation or damages.

After deliberating over all of the evidence submitted by both parties and making all credibility determinations necessary, the Magistrate Judge issued an extensive opinion in this matter finding that the defendants had been negligent under the Jones Act and that the VALDEZ has been unseaworthy and that both had been a cause of injury to the plaintiff. Additionally, the Magistrate Judge found that under both a Jones Act and unseaworthiness analysis the plaintiff had not contributed to his injuries in any way. A judgment was entered in favor of Gabriel Bonefont and this appeal followed.

8

## Analysis

### A. Standard of Review

When a case is tried to the court sitting without a jury, the trial court's findings of fact are not to be set aside unless found to be clearly erroneous, and its conclusions of law are reviewed *de novo*. *See* Fed. R. Civ. P. 52(a); *Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1012 (5th Cir. 1994). A clearly erroneous standard is appropriate for factual determinations because a reviewing court must give "due regard...to the opportunity of the trial court to judge the credibility of the witnesses." Fed. R. Civ. P. 52(a). In the maritime context, a trial court's findings of negligence, unseaworthiness and proximate cause are considered findings of fact and thus subject to the clearly erroneous standard. *Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62 (5th Cir. 1982); *Webb v. Dresser Industries*, 536 F.2d 603, 606 (5th Cir. 1976), *cert. denied*, 429 U.S. 1121 (1977).

In this appeal, Valdez Tankships Corporation, the owner of the vessel, and Maritime Overseas Corporation, the vessel's operator, assert that the trial court misconstrued the evidence in finding that the VALDEZ was unseaworthy, that such unseaworthiness was a proximate cause of injury to the plaintiff and that the plaintiff had not negligently contributed to his own injury.

### B. Unseaworthiness and Contributory Negligence

One of the two alternative theories of liability alleged by Mr. Bonefont in this matter was that the VALDEZ was unseaworthy and

9

that this unseaworthiness was a proximate cause of his injury. The general maritime law places upon a vessel owner an absolute non-delegable duty to provide a seaman with a vessel reasonably fit for its intended use, i.e. a seaworthy vessel. *See Comeaux v. T.L. James & Co., Inc.*, 666 F.2d 294, 298-99 (5th Cir. Unit A 1982); *Webb,* 536 F.2d at 606; *see also* 1 Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW §6-25 (2d ed. 1994)(hereinafter Schoenbaum). This duty furnishes seamen, and only seamen, with a separate and independent cause of action against a shipowner for unseaworthiness, distinct from any liability the shipowner may owe based on fault. *See The Osceola*, 189 U.S. 158, 175 (1903); *Aguirre v. Citizens Casualty Co. of New York*, 441 F.2d 141, 143-44 (5th Cir.), *cert. denied*, 404 U.S. 829 (1971); Schoenbaum at §6-27, p.345(The warranty of seaworthiness may only be claimed by those recognized as seamen under the law.).

The doctrine of unseaworthiness obligates a vessel owner to provide the seaman not only with a seaworthy vessel but with the necessary gear, equipment and crew needed to make the vessel reasonably fit for its intended use. *Webb,* 536 F.2d at 606; *Aguirre*, 441 F.2d at 144(For seaworthiness purposes there is no reason to distinguish between the fitness of the ship's gear, the ship's personnel, and the vessel itself.); *see* Schoenbaum at §6-25, p.333-4. "A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The

10

method of loading her cargo, or the manner of its stowage, might be improper." *Usner v. Luckenbach Overseas Corp*. 400 U.S. 494, 517-18 (1971)(internal footnotes omitted); *see Rogers v. Eagle Offshore Drilling Serv.*, 764 F.2d 300, 303 (5th Cir. 1985)("[A]n unsafe method of work may render a vessel unseaworthy...."); *Orient Mid-East Lines, Inc. v. Shipment of Rice on Board S.S. Orient Transporter*, 496 F.2d 1032, 1040 (5th Cir. 1974), *cert. denied*, 420 U.S. 1005 (1975)(An inadequate or incompetent crew may render a vessel unseaworthy.); *see also* 1B BENEDICT ON ADMIRALTY §24 (7th ed. 1996)(enumerating specific cases of unseaworthiness).

At trial, the plaintiff and AB Duggan gave testimony explaining the facts and circumstances surrounding the entire operation. They stated that the boatswain was in charge of the off-loading procedure and that they followed his orders throughout. Both seaman confirmed that they received no instruction or training concerning the loading of pipes of this nature prior to the commencement of the operation. In addition, the chief mate of the vessel, Mr. Kelly Forrest, testified that the boatswain in question was new to the VALDEZ at the time of the accident and was unfamiliar with the "idiosyncracies" of the ship. Moreover, a witness with a multitude of years experience in the maritime industry, Mr. Charles Walker, stated that the loading of large heavy pipes such as those in question was not a routine exercise to which a seaman would normally be familiar with in the course of his employment aboard various ships. Reviewing this testimony and the evidence as a whole, the trial court found the VALDEZ unseaworthy

11

for three reasons: "1) the boatswain was inadequately trained, 2) the boatswain and/or others inadequately instructed or trained crew members on appropriate loading operations, specifically failing to outline an appropriate 'game plan' for the loading of the pipes, and 3) the vessel did not have adequate lighting and/or equipment and/or tools to safely and reasonably facilitate communications between the boatswain and the winch operator."

A finding that the boatswain and/or the crew was inadequate or ill-trained for the task they were assigned represents a classic example of unseaworthiness. *Comeaux*, 666 F.2d at 299(quoting *June T., Inc.*, 290 F.2d at 407.). The trial court found that the boatswain in question was unfamiliar with the VALDEZ and that it was the boatswain's "professional shortcomings [that] led to the accident." Specifically, the court found that the boatswain chose to begin the unloading operation in the dark; to load the unbound pipes two at a time; and to communicate with the winch-man, who was working in a darkened area some distance away, using hand signals alone. Moreover, it was the boatswain who placed the plaintiff in an unsafe position as the pipes quickly dropped to the deck. As stated by the Magistrate Judge, "[t]he boatswain's failure to conduct the exercise in the proper manner due to his inexperience, and his lack of familiarity with the ship and her crew, are ultimately to blame for the haphazard method of loading the piping which caused Mr. Bonefont's subsequent injury." It was not clearly erroneous for the Magistrate Judge to find that the boatswain was inadequately trained to handle the loading operation he was

12

assigned and that this ill-training rendered the VALDEZ unseaworthy. *See Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 727 n.4 (1967)(A seaman inadequate for his calling may render a vessel unseaworthy.); *Brown v. Cliff's Drilling Co.*, 638 F.Supp. 1009, 1014 (E.D. Tex. 1986); *Cf. Rogers*, 764 F.2d at 303(Utilizing an unsafe method of work may constitute an unseaworthy condition.).

The defendants-appellants argue that even if the Magistrate Judge's findings as to unseaworthiness are found to be correct, the trial court's finding that unseaworthiness was a proximate cause of injury was clearly erroneous. This argument is without merit. To recover under an unseaworthy claim, the "'plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.'" *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991)(quoting *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir.), *cert. denied*, 488 U.S. 968 (1988)). The evidence is uncontroverted that Mr. Bonefont suffered an injury to his foot when the pipes being loaded on to the VALDEZ rapidly fell to the deck causing the top pipe to roll off the bottom pipe so fast as to prevent the plaintiff, in his position between the manifold pan and the pipes, from moving to safety. Furthermore, the evidence shows that the accident occurred in the manner it did because of the unseaworthiness of the vessel described above. It was not clearly erroneous for the Magistrate Judge to find that the unseaworthiness of the vessel was a proximate cause of injury to

13

the plaintiff.

In addition to the arguments made above, the defendants-appellants contend that the Magistrate Judge committed clear error when she found that the plaintiff was not contributorily negligent in her unseaworthiness analysis. The appellants assert that the trial court failed to hold Mr. Bonefont to the standard of care enunciated by this court in *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997)(*en banc*), *viz.* ordinary prudence under the circumstances. The record reflects otherwise.

The Magistrate Judge clearly considered a number of factors in finding that it was "reasonable" for Mr. Bonefont to have reacted as he did and that he had not been contributorily negligence. The trial court specifically referenced the plaintiff's age and experience at sea and found that while he had been a seaman for thirty-one years, Mr. Bonefont had no knowledge or experience in loading pipes of this nature and in fact had never participated in such an activity. The testimony also reflected that the loading operation was not a routine exercise that a seaman would normally encounter at sea. In assessing the plaintiff's education, the trial court noted not only the lack of prior knowledge through experience but also the total absence of training or instruction Mr. Bonefont was given in regard to loading the pipes. Furthermore, the Magistrate Judge properly considered the shipowner's duty to provide a safe work environment by recounting the boatswain's failure to conduct a safe operation or adequately instruct the plaintiff.

14

The trial court found that "[w]ith no instruction in safety procedures provided to the seaman aboard the VALDEZ and no specific training of any kind regarding the handling of pipe stores provided to the seamen aboard the VALDEZ, it was reasonable for Bonefont to have acted as he did." The record indicates that even though *Gautreaux* had not yet been decided the Magistrate Judge nevertheless properly held the plaintiff to a reasonableness standard and employed the factors later enunciated by *Gautreaux*. *Gautreaux*, 107 F.3d at 339.

We conclude that the Magistrate Judge's finding that the vessel was unseaworthy, the unseaworthiness was a proximate cause of injury to the plaintiff, and the plaintiff was not contributorily negligent, standing alone, support the judgment entered by the trial court in this matter. Therefore, this court need not address the defendants-appellants' contentions of clear error with regard to the Magistrate Judge's conclusions as to Jones Act negligence and contributory negligence under the Jones Act. *See Johnson,* 845 F.2d at 1354("We stress again that Jones Act negligence and unseaworthiness under general maritime law are two distinct causes of action, each involving separate standards of proof, causation, and review.").

## C. The Defendants' Motion for New Trial

Subsequent to the entry of judgment, the defendants-appellants moved for a new trial on the basis of fraud and/or false testimony. *See* Fed. R. Civ. P. 59 & 60(b)(3). The defendants' asserted that

15

the damages awarded by the trial court were based on the false testimony of Dr. Donovan and/or Mr. Bonefont because after the trial had concluded the plaintiff had attempted to return to work as a seaman and somehow procured a "fit for duty" card from his doctor's office. After reviewing the trial transcripts and the defendants' motion for new trial, the Magistrate Judge found no clear and convincing evidence of fraud, and, thus, denied the defendants' motion for a new trial.

We review a denial of a motion for new trial made pursuant to Fed. R. Civ. P. 60(b) for an abuse of discretion. *Smith v. Alumax Extrusions, Inc.*, 868 F.2d 1469, 1471 (5th Cir. 1989). When a party seeks a new trial on the basis of fraud, the moving party must prove fraud by clear and convincing evidence and show that the fraud prevented the party from fully and fairly presenting its case. *Diaz v. Methodist Hosp.*, 46 F.3d 492, 496 (5th Cir. 1995); 11 Charles A. Wright, et al., FEDERAL PRACTICE AND PROCEDURE, §2860 at 312-13 (2d 1995). In this case, the trial court found that the defendants had done neither.

The defendants' motion asserted that the trial court's award for future loss wages, which was predicated on the plaintiff being unable to return to work as a seaman, was allegedly based on false testimony because of the plaintiff's post-trial work as a seaman. The Magistrate Judge found that the defendants' motion for a new trial was an attempt to obtain evidence, *ex post facto*, in order to correct what they perceived as an error of fact in regard to the damages for future loss awarded by the trial court. In addition,

16

after reviewing the evidence presented at trial, the trial court held that Mr. Bonefont's post-trial activity did not render fraudulent Dr. Donovan's uncontroverted opinion or the plaintiff's testimony regarding his prior unsuccessful attempts to return to work as a seaman both of which had been relied on by the trial court in making its findings as to damages.

A Rule 60(b)(3) motion is not the proper vehicle for correcting alleged factual errors but is meant to prevent a party from prevailing unjustly. *Diaz*, 46 F.3d at 497; *Johnson*, 845 F.2d at 1358. In this case, the Magistrate Judge did not abuse her discretion in denying the defendants' motion for new trial on the basis of fraud or in denying their motion for discovery pending appeal.

## Conclusion

For the reasons assigned, the judgment of the trial court is AFFIRMED.

17